Jamie PITTMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–08–00710–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

June 17, 2010.

James W. Huggler Jr., Tyler, for appellant.

Michael J. West, Tyler, for appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and CHRISTOPHER.

## OPINION

TRACY CHRISTOPHER, Justice.

Appellant Jamie Pittman, the first of the alleged "Mineola Swingers"[1] was tried and convicted in March 2008 in Smith County, Texas of a single count of aggravated sexual assault of a child. He was sentenced to confinement for life. Appellant asserts five issues on appeal, but we reach only two. Appellant asserts the trial court reversibly erred by (a) not granting a new trial on *Brady*[2] violations, and (b) permitting the State to introduce evidence of multiple other sexual offenses allegedly committed against other children. Because we agree the trial court impermissibly allowed the State to interject extremely prejudicial evidence of multiple other sexual offenses allegedly committed by appellant (and others) into the guilt-innocence phase of this trial, we reverse and remand.

## I. Background

This case began when Department of Family and Protective Services ("DFPS") authorities in Smith County removed two children, Shannon, age seven, and Holden, age six,[3] from the home their mother, Shauntel Mayo shared with appellant. The children were removed after allegations of abuse and neglect were received by Smith County DFPS. After their removal, they went through several foster homes before being placed with foster parents John and Margaret Cantrell. At their first few foster homes, there were some indications of problems with the children: Holden suffered from bowel issues and was very aggressive, and Shannon acted very afraid.

Several months after being removed from their parents and once they were placed with the Cantrells, the children began to make outcries involving a ring of adults allegedly engaged in training Shannon, Holden, their four-year-old younger sister, Cathy, and their six-year-old aunt,

---

1. *See Mayo v. State,* 321 S.W.3d 576 (Tex. App.-Houston [14th Dist.2010]), tried in May 2008; *Kelly v. State,* 321 S.W.3d 583 (Tex. App.-Houston [14th Dist.2010]), tried in August 2008. All three appeals were transferred to this court.

2. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. We have employed pseudonyms for the children to protect their identities.

Ginny, to perform in a sexual manner in a club. The outcries began when the Cantrells took Shannon and Holden by an empty building they were considering purchasing in the city of Mineola in Wood County. The Cantrells immediately took the children to the Mineola Police Department (the "Mineola PD"), but, after a one-to two-day investigation, the Mineola PD did not file any charges. Shannon and Holden denied the allegations during a Wood County Children's Assessment Center interview.

Because the children were removed from their home in Smith County, the Cantrells and the Smith County DFPS enlisted the assistance of the Smith County District Attorney's office to further inquire into the children's allegations. Texas Ranger Phillip Kemp opened an investigation after being contacted by the Smith County District Attorney's office. Kemp interviewed Shannon and Holden and, through his investigation, discovered that Cathy and Ginny also were allegedly involved in the sexual exploitation ring. Cathy and Ginny were removed from the home of Sheila and Jimmy Sones. Sheila is the mother of Mayo and Ginny and the grandmother of Shannon and Holden. Cathy was placed with the Cantrells, and Ginny was placed with another foster family.

Shannon and Holden identified the building in Mineola as a "club" in which they had performed sexual acts for numerous adults in exchange for money collected by appellant and others, including Mayo. The children described a "sexual kindergarten" in which adults,[4] including appellant, Mayo, and Patrick Kelly, trained them to masturbate, strip, and engage in sexual contact with each another. The children alleged that they then performed

sexual acts at the club in Mineola, where numerous other adults watched, paid money, and filmed them engaging in the acts. The children also explained that the adults (appellant, Mayo, and Kelly) had given them "silly pills," which made them more willing to act in this manner. The investigation also revealed that Alicia, a friend of the other children, stated that Dennis Pittman raped her.

Following Kemp's investigation, appellant and several others were indicted for numerous counts of aggravated sexual assault of a child and engaging in organized criminal activity. However, appellant was only tried for a single count of aggravated sexual assault of a child, alleged to involve only Shannon and Holden. At his trial, the State proffered evidence of the allegations against the other defendants, as well as appellant's alleged involvement in offenses against Cathy, Ginny, and Alicia. Because appellant challenges the admissibility of this testimony we will briefly highlight that evidence. The objected-to evidence and argument began with the State's opening statement:

> The evidence in this case is going to show that the defendant and a group of other people would groom young children to perform sexual acts with themselves and others. You're going to hear from [Shannon]; you're going to hear from [Holden]; from [Cathy]; and from [Ginny], all children under 14 years of age. And what you're going to hear is that starting at the age of five, these kids were taken to kindergarten.
>
> . . .
>
> They went to kindergarten so Jamie Pittman, the defendant in this case, could teach them how to have sex. Their kindergarten, which was located at his trailer, was filled with dolls where

---

4. Cases are pending in a Smith County district court against three other defendants, including Dennis Pittman, Sheila Sones, and Jimmy Sones.

they would learn how to perform sexual acts using dolls.

Then they graduate into masturbation. The little girls [Shannon, Cathy, and Ginny] would masturbate. [Holden] would masturbate. Ultimately, they would have sex.

The end goal of kindergarten was to graduate, not into the first grade, not to use the tools that they've learned to better their lives, but graduation for these kids was going to a swingers' club in Mineola.

Smith County DFPS workers Amy McDonald, Alexia Hunter, and Kristi Hachtel all testified on direct examination by the State about the circumstances under which Shannon and Holden were removed from the home of Mayo and appellant; these circumstances involved allegations of neglect and drug abuse by appellant and Mayo. During the direct examination of Hunter, the State questioned her regarding a "continuing course of sexual abuse and exploitation" of Shannon, Holden, and Cathy. Hunter went on to describe allegations of abuse against all four children, naming appellant, Dennis Pittman, Shauntel Mayo, Sheila Sones, and Jimmy Sones as individuals involved in this continuing course of sexual abuse. Hunter explained that five-year-old Cathy would masturbate until she bled, which is a sign of sexual abuse. Hachtel described the DFPS investigation that led to discovery of other alleged victims and perpetrators. She testified that all of the various defendants were involved in this sex ring; that appellant tested positive for drugs; that he made the children watch pornographic movies; and that appellant abused Cathy and Ginny. Additionally, Virginia Mayo, Shannon and Holden's grandmother, testified that appellant and Mayo were bad parents who did not feed or clothe the children properly and that Cathy made an outcry to her about dancing, which led her to believe Shannon and Holden's story.

When Kemp testified, the State questioned him about all four children. He testified that appellant abused Ginny and Cathy and that all of the children were groomed at the kindergarten and then taken to the "swingers" club in Mineola to dance on the stage for money, to perform sex on stage, and to be videotaped by appellant having sex with each other. Kemp also identified the other defendants involved in the sex ring. During his testimony, State's Exhibit 37 was admitted showing a large family tree that lists eight children as having been abused by the six defendants. Also during Kemp's testimony, a two hour interview of Shannon and Holden was played to the jury detailing other victims and other defendants.

Margaret Cantrell, the foster mother of Shannon, Holden, and Cathy, not only testified as the outcry witness for Shannon and Holden, but also testified regarding the abuse of Cathy and Ginny. She further testified that Cathy masturbated until she bled.

Alicia, who was age fifteen at the time of appellant's trial, but who was eleven or twelve at the time of these events, testified that she and Shannon had visited another bar and strip club and were given drugs by Dennis Pittman—Alicia's stepfather—and appellant. According to Alicia, Shannon was told to strip on stage, and when she refused she was taken to a back room by appellant, Dennis Pittman, and "Tim." Alicia also testified that her step-father, Dennis, had raped her.

Ginny testified to doing "bad stuff" with Shannon and Holden in kindergarten, but stated that she never went to the club. She used appellant's name during her testimony but did not identify him in court. Cathy testified about doing sexual "stuff" in kindergarten, dancing at the club for money, and being videotaped by appellant doing sexual "stuff." Shannon and Holden

testified after most of the other witnesses in this case had testified; both testified about the other alleged perpetrators and victims. The only witness to testify after Shannon and Holden was the State's expert on child sexual assault, who related that all of the children's stories were consistent and believable.

In its charge, the trial court instructed the jury regarding the use of any extraneous offense evidence as follows:

> You are instructed that if there is any testimony before you in this case regarding the defendant's or any other individuals' having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity of the defendant or absence of mistake or accidence [sic], if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

During closing argument, the prosecuting attorney reminded the jury of this caveat, yet continued to focus on appellant's involvement in a child sexual abuse scheme:

> [Y]ou can consider that [extraneous offense evidence] for a limited—at this point in the trial, for limited reasons. *His plan, their plan, the scheme, how the operation worked, their knowledge, the defendants' identity.*
>
> Because let me stop you right there. *These kids were sexually assaulted, period.* Because if you want to go down the whole road of, "You know what; they just got into foster care and are making this up," let's go down that road for a second.

If that's true, explain to me—and if you buy that, if you buy that, I'll wait for you. I'll meet you at your homes. Explain to me then why little [Cathy], at five years old, is masturbating to the extent where her five-year-old vagina is bleeding. Explain that to me.

Explain to me then why [Shannon] knows how to do a striptease, why she's masturbating to the extent that she is. Explain to me that.

Explain to me why [Holden], nine-year-old [Holden], is using the bathroom on himself.

And that's just with those three. You know what? You can't explain that by saying this is all just made up. But it didn't end there. Explain to me if this is all made up, why [Ginny], who had absolutely no contact, tells you the same thing.

And explain to me why [Alicia], who's all the way up in Wisconsin, comes down here from there and talks to you about happy pills, [Shannon] dancing, Dennis Pittman, Jamie Pittman, and everybody else we've heard about.

Let me tell you something. This isn't some great conspiracy hatched by these kids, investigated by the Texas Rangers, and tried by the Smith County District Attorney's Office against Jamie Pittman. That's not what happened.

*What happened is, Jamie Pittman did this. As disgusting and vile as it is, he did it.*

. . .

And let's go over that. Let's go over what it was like. What must it be like to be five, six, seven, eight, and *the people you call Mommy, Daddy, Grandma, Grandpa teach you how to masturbate using dolls when you're five.*

They divide you in different classes. They teach you how—using these dolls, how to masturbate. *And these are the*

*same people who are supposed to protect you.* These are the same people who are supposed to do anything they can to ensure that you don't have to go through this. But what they do, what Jamie Pittman does, is he takes them to his house, to Booger Red's house, to Mineola, and he teaches them how to masturbate using dolls. *And Shauntel Mayo, Booger Red, and Dennis Pittman, Sheila Sones, Jimmy Sones teach them how to strip, teach them how to dance, teach a sister how to have sex with her brother, teach an aunt how to have sex with her niece and her nephew and vice versa.*

(emphasis added). The prosecuting attorney continued his closing argument in a similar vein, emphasizing that appellant, Mayo, Kelly, Dennis Pittman, Sheila Sones, and Jimmy Sones all worked together in a group to groom the children by teaching them to masturbate and dance together, culminating their "education" by forcing them to strip and have sex with each other at the club in Mineola.

After hearing the evidence and argument of attorneys, the jury found appellant guilty as charged in the indictment and sentenced him to life in prison. Appellant timely appealed.

## II. Issues Presented

Appellant presents five issues for our review. In his first issue, appellant contends the trial court erred in denying his motion for new trial based on *Brady* violations. In his second issue, appellant asserts the trial court reversibly erred by permitting the State to introduce evidence of drug use and multiple other sexual offenses appellant allegedly committed against other children. We do not reach issues three through five.

## III. Analysis

### A. This Record Does Not Confirm *Brady* Violations

 Appellant asserts the trial court erred in denying his motion for new trial based on the State's failure to disclose exculpatory evidence to him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We review a trial court's ruling on a motion for new trial for an abuse of discretion. *State v. Herndon*, 215 S.W.3d 901, 906–07 (Tex. Crim.App.2007).

Appellant filed a motion for new trial on April 28, 2008,[5] alleging the Smith County District Attorney had concealed exculpatory information from his defense team in violation of *Brady*. This information involved an investigation in California, where the Cantrells previously lived, concerning allegations that John Cantrell had sexually molested at least one of his former foster children. Appellant attached an affidavit to his motion for new trial in which his attorney averred that he had discovered the ongoing California investigation through contact with the Wood County District Attorney's office. The Smith County prosecutor responded that the Smith County District Attorney's office was unaware of this information. The motion for new trial was overruled by operation of law.

In his original brief on appeal, appellant asserts two areas of *Brady* information that were not disclosed to him: (1) John Cantrell was the subject of an aggravated sexual assault investigation in California following a complaint by other foster children, and (2) Kemp had located and interviewed at least one of the owners of the Mineola "swingers" club, Sherry Adams,

---

**5.** This was before the start of Shauntel Mayo's trial. *See Mayo v. State*, 321 S.W.3d at 578, footnote 1.

who had explained that no children had ever been admitted to the club and that she did not recognize any of the defendants arrested and charged in these cases. In supplemental briefing after oral argument, appellant identified other previously undisclosed exculpatory material, including two videotapes of two of the children denying any abuse occurred, a seventy-nine page report from Kemp of which only fifty-five pages had previously been produced, and hand-written notes by Kemp, including notations recommending interviews of other children Shannon had identified as being abused.

The only *Brady* complaint included in the record of **this case,** however, concerns the sexual assault allegations against John Cantrell. As noted above, appellant identified this information in his motion for new trial; his attorney attached an affidavit to the motion indicating that he discovered these allegations from the Wood County District Attorney's office. However, the State's prosecuting attorney, Joseph Murphy, responded to the motion for new trial with an affidavit, dated June 10, 2008, in which he stated that he "had no knowledge of any allegations [against John Cantrell] that were made in California and had no way of ascertaining that information. A run of Mr. Cantrell's Criminal History contains no felony arrests or convictions for any offense out of California." He denied that Wood County had supplied this information to him or to his office.

■ On the day of oral argument in this case, Wood County filed an amicus curiae brief through its District Attorney. The brief contained sworn grand jury testimony from a Wood County DFPS employee who claimed that both Kemp and a Smith County Assistant District Attorney, Tiffany Wickel, knew about the allegations against Cantrell in 2005 and 2007 respectively. However, this court is constrained to review only the record in this case. Although appellant argues that Wood County's District Attorney's brief should be considered an admission by a party opponent because both Wood County and Smith County represent the State, he cites no cases in support of that proposition. We decline to so hold. Furthermore, amicus briefs generally cannot be used to supplement the record. *Cf. Booth v. State,* 499 S.W.2d 129, 135–36 (Tex.Crim.App. 1973) (observing that "the office of amicus curiae is to aid the court and it cannot be subverted to the use of a litigant in the case" and that a brief challenging the validity of record testimony is not a proper function of an amicus curiae).

Appellant's motion for new trial did not mention the other exculpatory evidence that he now claims should have been revealed. Part of this information was discovered during Patrick Kelly's trial and is not part of this record; part of this information was discovered in the Dennis Pittman pre-trial proceedings and also is not part of this record. *See Smith v. State,* 540 S.W.2d 693, 697 n. 4 (Tex.Crim.App. 1976) (op. on reh'g) (citing *Booth,* 499 S.W.2d at 135–36 and noting that trial transcript from another trial is not properly a part of record on appeal and cannot be considered by appellate court). Thus, we may not consider it in this appeal and appellant's only remedy, if necessary, is through a habeas corpus proceeding.[6]

In sum, " '*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist.' " *Harm v. State,* 183 S.W.3d 403, 407 (Tex.Crim.App. 2006) (quoting *Hafdahl v. State,* 805 S.W.2d 396, 399 n. 3 (Tex.Crim.App.1990)).

---

**6.** Because we reverse and remand this case on another issue, we are confident that Smith County will provide any and all exculpatory evidence to appellant before his re-trial.

The record **in this case** reflects that Smith County issued a sworn statement that it did not have the *Brady* information regarding John Cantrell in its possession during appellant's trial. Being constrained to review only the record of this case, we cannot say the trial court abused its discretion in failing to grant appellant's motion for new trial. We therefore overrule his first issue without reaching the issue of bad faith.[7]

## B. Evidence of Extraneous Offenses Should Not Have Been Admitted

Appellant asserts in his second issue that the trial judge erred in permitting the State to introduce evidence of drug use by the appellant, multiple other sexual offenses allegedly committed by appellant and five others, including multiple sexual offenses involving three more child victims. Over appellant's objections based on Texas Rules of Evidence 403 and 404(b),[8] the State proffered evidence regarding the involvement of each of the other charged defendants in the case, as well as appellant's involvement in offenses against Cathy, Ginny and Alicia, to show appellant's "scheme" or "plan."

Appellant obtained running objections to all testimony regarding his alleged drug use and all testimony about and by the other children allegedly abused by appellant and the other defendants. Such testimony included allegations of sexual "grooming" of numerous children by six adults, the existence of a child sex ring, children dancing for money, videotaping the children having sex, providing drugs to the children, showing them pornographic movies, and the rape of Alicia by Dennis Pittman.

### 1. Standard of review.

We review a trial court's evidentiary rulings for an abuse of discretion. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim.App.2001). The erroneous admission of extraneous-offense evidence constitutes non-constitutional error, reviewable for harm under Texas Rule of Appellate Procedure 44.2(b). *Hernandez v. State*, 176

---

**7.** Appellant cites *Oregon v. Kennedy*, 456 U.S. 667, 676, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), and *Ex parte Masonheimer*, 220 S.W.3d 494, 506 (Tex.Crim.App.2007), to support his claim that, if bad faith is found in the State's actions, a retrial is barred. However, these cases discuss and delineate the " 'narrow exception' to the general rule that there is no jeopardy bar to a retrial *after a defense-requested mistrial.*" *Masonheimer*, 220 S.W.3d at 506–07 (citing *Kennedy*, 456 U.S. at 673, 676, 678–79, 102 S.Ct. 2083) (emphasis added). This exception usually means that a retrial *after a defense-requested mistrial* is barred by double jeopardy only when the prosecutorial conduct giving rise to the mistrial was "intended to provoke [or goad] the defendant into moving for a mistrial." *Masonheimer*, 220 S.W.3d at 506 (citing *Kennedy*, 456 U.S. at 676, 679, 102 S.Ct. 2083). Thus, neither of these cases support appellant's contention that a retrial is barred when an appellate court reverses for *Brady* violations. *See also Ex parte Legrand*, 291 S.W.3d 31 (Tex. App.-Houston [14th Dist.2009, pet ref'd])

(holding that there is no double jeopardy after a verdict was reversed on appeal); *Ex Parte Graves*, 271 S.W.3d 801 (Tex.App.-Waco 2008, pet. ref'd) (same).

**8.** Texas Rule of Evidence 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Tex.R.Evid. 403. Rule 404(b) provides that, although not admissible to prove conduct or behavior in conformity with character, extraneous offense evidence may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" so long as, if requested by the accused, proper notice has been provided in advance of trial. Tex.R. Evid. 404(b).

S.W.3d 821, 824 (Tex.Crim.App.2005). This rule provides that we must disregard "any [non-constitutional] error, defect, irregularity, or variance that does not affect [an appellant's] substantial rights[.]" TEX. R.APP. P. 44.2(b).

**2. Admitting the evidence was an abuse of discretion.**

### a. The trial court's reason for admitting the evidence

This trial involved the single indicted offense of aggravated sexual assault of a child. The State sought to consolidate this charge with three other offenses under Texas Penal Code section 3.01 but was unsuccessful and proceeded to trial on this charge alone.

We begin by noting that although appellant focuses on the trial court's decision to admit this evidence over his Rule 403 objection, the trial court seemingly permitted much of the extraneous-offense evidence to show appellant's "plan" to engage in a sexual exploitation/abuse scheme with several other defendants. *See* TEX.R. EVID. 404(b) (permitting introduction of extraneous-offense evidence to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). For example, the trial court stated in overruling appellant's objections to extraneous-offense evidence during the testimony of DFPS worker Hachtel, "It surely shows plan, scheme and design." The trial court further observed, "[T]he theory of the State's case is that this was a sex ring, that there was more than just one individual involved in it."

But appellant was charged with only a single count of aggravated sexual assault of a child, alleged as follows:

[Appellant] did then and there intentionally or knowingly cause the female sexual organ of [Shannon], a child who was then and there younger than 14 years of age and not the spouse of the defendant, to contact and penetrate the sexual organ of [Holden.]

He was not on trial for multiple counts of aggravated sexual assault involving victims other than Shannon and Holden; neither was he being tried for engaging in an organized scheme or plan to sexually assault multiple victims.

As the Court of Criminal Appeals has explained,

Unfortunately, courts frequently admit evidence of extraneous acts under this exception not to show acts the defendant took in preparation for the ultimate charged offense, but to show repeated acts that are similar to the charged offense. Repetition of the same act or same crime does not equal a "plan." It equals the repeated commission of the same criminal offense offered obliquely to show bad character and conduct in conformity with that bad character— "once a thief, always a thief." This bad-character—conformity purpose, whether express or not, is precisely what is barred by Rule 404(b). Thus, if the proponent is unable to articulate exactly how an extraneous act tends to prove a step toward an ultimate goal or overarching plan, the evidence is not admissible to prove part of a "plan."

*Daggett v. State,* 187 S.W.3d 444, 452–53 (Tex.Crim.App.2005). Similarly, the evidence of extraneous acts admitted here does not show a plan to sexually assault Shannon and Holden. Rather it is evidence of repeated occurrences of the same bad act, compounded by numerous additional bad acts.

On appeal, the State argues the evidence was necessary to show appellant's intent, but this basis for admitting this evidence was not asserted in its proffer at trial, other than in generalized quotes of the language of Rule 404(b). Further, appellant did not assert that the children were

"accidentally" sexually assaulted or that they had "consented." The State further argues in its brief that the evidence showed that appellant had abused three other children in an identical manner, but this argument is not supported by the record. For example, Alicia did not testify to abuse by appellant, only by Dennis Pittman. The State argues that "all five children" testified to being trained by appellant at kindergarten to sexually perform, when in fact Alicia did not testify to that. Alicia did not testify about kindergarten or the club in Mineola. With this in mind, we turn to appellant's Rule 403 objections.

### b. Rule 403 balance weighs against admission.

■ In determining a Rule 403 objection, the trial court balances the probative force of and the proponent's need for the evidence against any tendency of the evidence to (a) suggest a decision on an improper basis, (b) confuse or distract the jury from the main issues, (c) be given undue weight by a jury not equipped to evaluate the probative force of the evidence, and (d) consume an inordinate amount of time or repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex.Crim.App.2006).

### i. Probative force and necessity of the evidence

■ We begin our analysis of this issue by examining the probative force and the need for this evidence. As noted above, appellant was on trial for a single offense: aggravated sexual assault of a child, involving only Shannon and Holden. The proffered extraneous-offense evidence included evidence of drug use by appellant, and testimony that appellant and several other defendants trained numerous children in sexual activity by conducting a "sexual kindergarten," where the children learned to masturbate, dance "sexy," and touch each other inappropriately. Evi-

dence also was offered to show that appellant and these other defendants transported the children into another county and forced them to perform sexual acts in front of other pedophiles from whom they received money, and that appellant and the other defendants provided drugs to these children to get them to perform sexually and sometimes filmed them engaging in sex acts. In addition, the proffered evidence included testimony regarding offenses against several children who were not included in the indictment. But this extraneous-offense evidence does not appear to be particularly probative of the offense for which appellant was actually being tried—the aggravated sexual assault of Shannon and Holden. *Cf. Daggett*, 187 S.W.3d at 450–51 ("While such [extraneous-offense] evidence will almost always have probative value, it forces the defendant to defend himself against uncharged crimes as well as the charged offense, and encourages the jury to convict a defendant based upon his bad character, rather than proof of the specific crime charged.").

Further, this evidence was not necessary to prove the allegations against appellant; the testimony of Shannon and Holden alone, if believed by the jury, would have been sufficient to convict appellant. *See* TEX.CODE CRIM. PROC. ANN. art. 38.07 (providing that testimony of child under 17 alone is sufficient to convict defendant of sexual assault of a child).

Finally the State argues that the other children were eyewitnesses to the abuse and that they had to testify as to why they were at the club and kindergarten. First, not all of the children were alleged eyewitnesses. For example, Alicia did not testify that she witnessed an assault involving Shannon and Holden. Cathy did not testify to seeing an assault between Shannon and Holden, and Ginny testified she never went to the club. Second, there is no

reason that an eyewitness would have to testify as to why she was at the club or kindergarten or whether she was abused, or testify to any of the other extraneous acts presented in this trial. We thus conclude that the extraneous-offense evidence in this case was neither particularly probative of the charged offense nor necessary to the State's case.

### ii. Balancing factors

■ We next turn to the other Rule 403 factors against which this evidence must be balanced: the tendency of the evidence to (a) suggest a decision on an improper basis, (b) confuse or distract the jury from the main issues, (c) be given undue weight by a jury not equipped to evaluate the probative force of the evidence, and (d) consume an inordinate amount of time or repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42.

Appellant was charged with one count of aggravated sexual assault of a child, but during the direct examination of Ranger Kemp, the following exchange occurred:

Q.: Is there a continuing course of criminal conduct that you discovered that started when these kids were five-year-old kids and went to kindergarten up until they were able, for lack of a better term, graduate to being able to have sex with one another on a stage in Mineola, Texas, filled with other perverts who are sitting there paying money, watching them?

A.: Yes. It was all one continuing scheme.

During the testimony of Margaret Cantrell, the State made the following observation: "[W]e're talking about children who were forced to engage in sexual conduct and contact with brothers and sisters, with aunts, dancing around so people like Jamie Pittman could make money and fulfill his sexual desires."

The evidence took up a vast amount of time and was repeated by many witnesses. As detailed above, the State focused extensively on the extraneous-offense evidence throughout appellant's trial, from opening statement, through the direct examination of witnesses, to closing argument. In fact, during the entire guilt-innocence portion of appellant's trial, there were only three minor witnesses (out of fifteen) who did not testify about the other defendants and the other alleged victims and crimes.

We thus conclude that this extraneous-offense evidence had an extremely strong tendency to suggest a decision on an improper basis, to confuse or distract the jury from the main issues in this case, and to be given undue weight by a jury not equipped to evaluate its probative force. After balancing the lack of probative force and necessity here versus the potential harm of the evidence, we hold that the trial court abused its discretion in overruling appellant's Rule 403 objections.

### 3. Appellant's substantial rights were affected.

■ "The general rule in all English speaking jurisdictions is that an accused is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The rule is now deemed axiomatic and is followed in all jurisdictions." *Young v. State*, 159 Tex.Crim. 164, 165, 261 S.W.2d 836, 837 (1953). Here, admission of this extraneous-offense evidence permitted the State to portray appellant as a drug abuser and as a sexual predator engaged in an organized and ongoing scheme involving multiple sexual assaults against multiple children, sexual performances of a child, and child pornography. This alleged scheme included a group of like-minded child predators (who were in a position of trust and authority as parents, grandparents, or stepparents) working together to

"groom" a group of very young children—all under the age of six or seven—to perform sexually with each other at a "sexual kindergarten." It was alleged that at this "kindergarten," these adults taught the children to masturbate, touch each other, and engage in sex acts. These adults also allegedly provided drugs to the children to make them more willing to engage in these activities. According to the State, the ultimate goal of this group of child predators was to have the children perform sex acts in front of other pedophiles for money. This group of pedophiles also filmed the children engaging in these sexual activities. One of the other adults also purportedly raped his twelve-year-old step-daughter.

Considering the manner in which this evidence was introduced—by the State—on direct examination, rather than on redirect or as rebuttal evidence, the focus of the State's opening statement and closing arguments, and the extremely prejudicial nature of the evidence itself, we conclude that the introduction of this evidence had a substantial and injurious effect or influence in determining the jury's verdict. *See Motilla v. State,* 78 S.W.3d 352, 355 (Tex.Crim.App.2002). Indeed, it is difficult to imagine how a juror could have considered this inflammatory, prejudicial evidence only for non-character purposes. We therefore sustain appellant's second issue.

### IV. Conclusion

Had the State tried appellant only for the offense with which he was charged, aggravated sexual assault of a child, it might have convicted him of that offense. Unfortunately, in this case, the trial court permitted the State to try appellant for being a criminal generally, rather than for

the offense for which he was indicted. In fact, he was tried for being the worst sort of criminal: a child predator who engages in an organized and ongoing scheme with other pedophiles to sexually abuse young children. We therefore sustain appellant's second issue and, without addressing his other three issues,[9] reverse and remand for a new trial.

---

**9.** *See* Tex.R.App. P. 47.1 (stating that courts of appeals must issue an opinion that is "as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").