**AFFIRMED as MODIFIED and Opinion Filed December 5, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00724-CR

**MICHAEL LYNN ROGERS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1800263-T**

## MEMORANDUM OPINION
Before Justices Bridges, Whitehill, and Schenck
Opinion by Justice Bridges

A jury convicted appellant Michael Lynn Rogers of capital murder, and he received an automatic life sentence.[1] He raises seven issues on appeal. He first argues the trial court abused its discretion by admitting evidence of his membership in the Aryan Brotherhood. In his six remaining issues, he contends the State and the trial court misstated the law of transferred intent during jury selection resulting in six jurors being improperly challenged for cause. As modified, we affirm the trial court's judgment.

### Background

Greg Collier and appellant met while working together at Texas Highway Markings in Cedar Hill. Appellant noticed Collier's tattoos and asked if he was a member of the Aryan

---

[1] His indictment was enhanced by two prior convictions: burglary of a vehicle and murder.

Brotherhood. Collier said he was a brother and the two began talking. He learned appellant's nickname within the Brotherhood was Texas Mike.

Late in the evening on July 15, 2016, Collier, Shelvie Spriggs (Collier's girlfriend), and John Paul Street went to appellant's home to get methamphetamine and hang out. Appellant had provided them with meth almost daily for several months. John Paul ("Freight Train") was a member of the White Knights and lived with Collier and Shelvie. Shelvie described John Paul as "Greg's little sidekick, so pretty much wherever Greg went . . . , he tagged along."

On this particular night, John Paul planned to "do a tattoo" on appellant's daughter, Stephanie Rogers. When they arrived, Collier noticed appellant and Joaquin Garcia doing heroin and "speedballs," a mixture of methamphetamine and heroin. Garcia was a member of Tango Blast.

Around 1 a.m., appellant's wallet disappeared. He was "freaking out" thinking someone stole it. In the meantime, Jimmy Patrick, another Brotherhood member known as "Jimbo," arrived. The group continued looking for appellant's wallet.

A short time later, Alberto Gonzalez (decedent) approached Collier and John Paul on appellant's front porch and asked if appellant was home. They said yes, and Gonzalez went inside. When Collier and John Paul went inside, they heard appellant and Gonzalez arguing about money. Appellant accused Gonzalez of stealing his wallet and $600. The yelling escalated. Shelvie heard Gonzalez crying for help. Collier went to the kitchen to see what has happening and saw appellant and Garcia hitting, punching, and kicking Gonzalez. Collier said it seemed like appellant knew Gonzalez.

Collier joined the fight because he felt like Gonzalez "did [appellant] wrong stealing his money." He felt he owed appellant because of their Brotherhood ties and appellant's leadership

position within the gang. Specifically, appellant was a "major" in Region 2, meaning he was the second highest ranking member of the Brotherhood in the North Texas area.

At one point during the beating, appellant left the kitchen and went to his bedroom. Garcia and Collier continued assaulting Gonzalez. Appellant returned to the kitchen after hearing a beer bottle smash and told the men they were being too loud.[2] Appellant then helped Gonzalez to a chair and started negotiating about the money. Appellant told Gonzalez he could mow his lawn until the money was paid off. Collier thought the argument was over.

Appellant then left Gonzalez in the kitchen, returned to the living room, and asked if anyone wanted to get high. Appellant, John Paul, Jimmy Patrick, Garcia, and Collier went to appellant's room and did a "bump" of methamphetamine.[3] At this point, Collier said Gonzalez was free to leave but that quickly changed.

After consuming the drugs, appellant retuned to the kitchen with a pipe. Garcia and Jimmy Patrick followed, but Garcia did not stay long and left. Appellant and Gonzalez started arguing again about the money and the situation escalated. Collier went to the kitchen and told appellant he was leaving, but appellant told him to "chill out" and let him "take care of it." Collier respected appellant's rank in the Brotherhood and knew he could "tell anybody in the family to do whatever he wants."

Collier then watched John Paul hit Gonzalez "out of nowhere" in his right leg with a hammer. Appellant heated up a spoon on the stove and handed it to John Paul, who burned Gonzalez on the cheek like a brand. Collier described Gonzalez as "gritting" and not screaming, but rather taking the assault and not fighting back. At this point, Collier felt things had gone too

---

[2] Collier smashed the beer bottle on Gonzalez's head. He claimed he did not want to participate, but he wanted them to think he wanted to. "Like one foot in, one foot out type" of thing. He testified he did not participate any further in the assault.

[3] A "bump" causes a "rush" and gives "a lot of energy."

far, and he went to the living room. He did not feel he could leave the house because he did not want the others to think he would tell anyone what happened.

Appellant then retrieved a machete from underneath a couch cushion in the living room and returned to the kitchen where Collier saw him hit Gonzalez's arm with the blunt side of it. John Paul and appellant then continued punching Gonzalez.

By this time, the assault had been going on for over two hours. Appellant said they could not let Gonzalez leave because he would tell.

Appellant went to his bedroom and returned with a drill. He took the drill into the kitchen, and Collier heard drilling sounds. Shelvie walked passed the kitchen and saw appellant drilling holes in Gonzalez's skull near his temple. She saw another hole in his chest and below his abdomen.[4] Shelvie later heard appellant say he stuck a broom handle "up his a**."

The record is unclear when Gonzalez died but by early morning, appellant wanted to dispose of the body. Appellant told the others he wanted to use Collier's car to do it. Collier refused so John Paul called his brother-in-law, Gary Paul Rench, who agreed to bring his car. As Collier walked passed the kitchen on his way to meet Rench out front, he saw Gonzalez's body rolled up in a blanket against the kitchen stove. Rench brought in a tool box to load up the body. Collier refused to help load the body until appellant threatened him with "a D," or a "disciplinary," for disobeying a direct order.[5] Depending on the seriousness of the situation, the "D" could range from a beating to something more severe. Given that appellant had drilled Gonzalez's body, Collier decided he better help "because their ain't no telling what [appellant] might do."

After putting the body in the tool box and loading the truck, appellant told the others to follow the truck. Rench refused to drive his truck so Jimmy Patrick volunteered. Collier, John

---

[4] Officers later recovered the drill from the kitchen.

[5] Shelvie testified that appellant said Collier's "participation in it wasn't up to his standards or he wasn't as sick and twisted as John Paul was, so he was going to get a discipline."

–4–

Paul, and Shelvie followed in Collier's car, and appellant followed in his Blazer. They drove to a wooded area with a creek where appellant and Jimmy Patrick attempted to dump the tool box into the water. Jimmy Patrick thought they needed to destroy evidence and suggested burning the body. Collier could not remember who poured gasoline on the tool box, but he thought Jimmy Patrick set it on fire. They watched the tool box melt to the ground before leaving. By this time, it was daylight.

Collier, Shelvie, appellant, and John Paul returned to appellant's house. The men began cleaning the crime scene. All of the weapons used to torture Gonzalez were given to Jimmy Patrick.

On July 16, 2016, two men were fishing in an area off a dirt road in Irving, Texas. The area was covered with trees and somewhat hidden. As they neared the water, they saw a burned, dead body. They did not know how long the body had been there, but thought the ashes were still fresh. One of the men immediately called police.

Officer Eric King and his partner responded to the call. They gathered information from the two men who found the body and insured the integrity of the crime scene. They immediately noticed a chemical smell, like an accelerant, near the charred body. Based on the smell, they determined the body had recently been dumped.

Detective Adam Mayorga took control of the crime scene. A medical examiner retrieved the body. For several days, officers gathered evidence in the wooded area near the body's location. Officers reviewed surveillance videos from nearby roads and gas stations but did not pick up any leads.

In late July, Detective Mayorga received a phone call from Steven Vangeen, a Homeland Security Investigator in Houston. Vangeen said an informant provided information that someone named Jimmy Patrick, referred to as "Jimbo," had killed somebody by beating, stabbing, and

dumping the body. Detective Mayorga also received appellant's, Collier's, and John Paul's names. He used the names to track cell phone numbers for appellant and Jimmy Patrick and then executed search warrants.

When officers searched appellant's house, they knew the crime scene had been cleaned. They used Bluestar, a chemical that reacts with the iron in blood, to determine what happened and what objects may have been involved in the murder. Officers recovered several objects from the home, including machetes, hammers, a drill, a mop, and a broom, which reacted presumptively for the presence of blood. Three out of four kitchen chairs reacted when sprayed with Bluestar.

DNA testing on several objects indicated that appellant, Collier, and Gonzalez could not be excluded as DNA contributors but none of the samples showed a strong DNA statistic to any one person.

Detective Kevin Burkleo interviewed appellant (portions of which were shown to jury). After Detective Burkleo told appellant he was investigating a capital murder, appellant told him he only got into a fist fight at his home with a Spanish male who stole his wallet containing $600. Appellant changed his story throughout the interview. For example, he first denied knowing Gonzalez but later said he sold "ice" to him three or four times. Appellant first told Detective Burkleo he left for about thirty minutes to get marijuana, and when he returned, Gonzalez was dead. Then later in the interview, he admitted he saw Gonzalez get hit with the hammer and drilled in the shoulder, and he may have still been alive then. He laughed during portions of the interview while describing how they "whipped his a**," but denied killing him. As the four-hour interview progressed, appellant brought up other details about the torture session such as someone using a machete. He also recalled seeing Gonzalez drilled in the stomach. Appellant mentioned the mop without prompting but when asked if anyone "shoved [it] somewhere," he said no. However, he admitted John Paul threatened Gonzales with it. At the end of the interview, appellant said, "The

–6–

a** whooping, yes, I'm guilty of that. I did whoop the guy . . . we fought like men but that was it." Detective Burkleo then explained accomplice law in Texas and told appellant he participated in the "killing of this guy." Appellant responded, "I mean, to a certain degree . . . I mean, everybody participated."

Dr. Candace Schoppe conducted the autopsy. She discovered a metal rod in Gonzalez's leg with the serial number still intact from a previous surgery. She traced the serial number back to the manufacturer, which led her to his medical records confirming that he had surgery in 2013 to place implants in his leg and clavicle. These records confirmed the victim's identification.

She observed small blister-like burns on the body that were suggestive of a splash pattern from an accelerant and noted a chemical smell from the charred body. Most of the skin was burned away and some organs were exposed. These observations indicated death by homicide.

As she started her external examination of the body, she noted four stab wounds to the head.[6] Two of the stab wounds were on the right side of the head in the temple area. She tracked the wounds through the scalp, the muscle, and into the skull. When she removed the brain, she observed bleeding on the right side where the stab wounds penetrated. One stab wound tracked through the temporal lobe, into the center of the base of the skull, and into the sinus cavity. The other wound tracked behind the soft tissue of the eye. A third stab wound on top of the nose tracked through the space in the nose and back of the mouth and through the brain stem. The bone near the wounds was crushed such that "whatever was kind of around the instrument that penetrated into the skull was pushed up against the skull enough so that it kind of crushed the bone on the outside," which would not occur with a gunshot wound. No bullets were recovered from

---

[6] She explained to the jury the forensic definition of a stab wound is any instrument that perforates into a tissue, and it does not have to be from a knife but rather any instrument with a point that can penetrate the body.

the head further confirming the "penetrating injuries." Similar wounds were on his chest cavity and back.

In addition to the crushed nose bone, she observed multiple rib fractures on the left side of the body. These injuries were the result of blunt force trauma. The body suffered extensive thermal injuries from being set on fire, but she did not find any indication he was alive when it happened.

She found injuries of indeterminate origin. These included damage to the left side of his intestines, lower left side of his abdomen, and holes in the small bowel and in parts of the colon that holds the bowels into the body. A small amount of feces was in the pelvis meaning something had forced it up into this area. She described the injury as "smooth and even all the way around" the hole. The injury was consistent with someone being sodomized by a broomstick or mop handle, but she could not confirm if sodomy actually occurred.[7]

Gonzalez's right leg had a penetrating injury similar to the other injuries, and his left femur was broken and misaligned. Given the amount of thermal damage to the body, however, she could not definitively provide the cause of these injuries. Finally, she noted about a liter of watery fluid in the stomach, which contained some granular sediment. This raised the possibility of a drowning component, especially given where the body was found, but she explained drowning is typically a "diagnosis by exclusion." Ultimately, Dr. Schoppe concluded death by homicidal violence.

The State charged appellant with capital murder. At the conclusion of the guilt-innocence phase, the jury was instructed it could find appellant guilty of capital murder as a principal, party, or conspirator. The jury found appellant guilty of capital murder, and he received an automatic life sentence.

---

[7] At the time of her autopsy, she did not know a sexual assault may have occurred. If she had, she would have removed the whole "pelvic block" and preserved it for a more thorough examination.

**Admission of Evidence**

In his first issue, appellant argues the trial court abused its discretion by admitting evidence of his membership in the Brotherhood because its prejudicial nature outweighed any nominal probative value. The State responds appellant's gang membership was admissible to show a non-character purpose that tended to show the commission of a crime under rule of evidence 404(b)(2), and any prejudicial effect did not substantially outweigh its probative value of explaining the circumstances surrounding the crime. *See* TEX. R. EVID. 404(b)(2) (evidence may be admissible for proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident). Specifically, the State contends appellant's high rank in the Brotherhood influenced the actions of other people in the house and such evidence helped the State explain, and the jury understand, why the missing $600 escalated into hours of torture and the eventual death of Gonzalez.

Prior to voir dire, the trial court ruled the State could discuss gang affiliation and granted a running objection to all evidence regarding the Brotherhood. A trial court's ruling to admit evidence is reviewed for an abuse of discretion. *Duntsch v. State*, 568 S.W.3d 193, 215 (Tex. App.—Dallas 2018, pet. ref'd). Assuming without deciding or expressing approval of the trial court's admission of the gang-related evidence, we conclude appellant failed to establish harm.[8]

Admitting evidence that should be excluded by rule 401, rule 403, or rule 404(b) is non-constitutional error. *See Banks v. State*, 494 S.W.3d 883, 895 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *see also Pittman v. State*, 321 S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Such error is reversible only if it affected appellant's substantial rights to a fair trial. *See* TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial

---

[8] Neither appellant nor the State provided a harm analysis. However, we are cognizant of our duty to conduct such an analysis regardless of whether either party briefed it. *See Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) (en banc) (parties may assist by suggesting how the appellant was or was not harmed, but it is the responsibility of the reviewing court to decide whether it is likely the error had some adverse effect on the proceedings); *see also DeLaPaz v. State*, 228 S.W.3d 183, 202 (Tex. App.—Dallas 2007, pet. ref'd) (neither party has burden to prove harm).

and injurious effect or influence in determining the jury's verdict. *Diamond v. State*, 496 S.W.3d 124, 143 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). If the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless. *Id*.

In assessing the likelihood that the jury's decision was adversely affected by the error, an appellate court considers everything in the record. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). This review includes testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire, if applicable. *Id*. Important factors include the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id*. It may also include whether the State emphasized the error and whether overwhelming evidence of guilt was present. *Id*.

We begin with voir dire. Defense counsel asked potential panel members most of the questions regarding their feelings on gang affiliation. Defense and the trial court asked follow up questions and provided further explanation when necessary to ensure that the potential jurors understood the State had to meet its burden of proof for the charged offense and should not convict appellant because of any alleged gang affiliation. The trial court emphasized "you need to be able to listen and make a fair judgment." The judge told them "jurors who will be picked to hear this case are going to base their verdict on the facts and evidence, not based on an affiliation or non-affiliation. . . . And if you can't, then we want to know that." After reviewing voir dire, we cannot conclude it shows any harm to appellant. By informing potential jurors up front that gang affiliation could play a role in the case and questioning them about their beliefs, the trial court, the State, and the defense achieved one purpose of voir dire—eliciting information that shows a bias

or prejudice against gang members rather than considering facts and evidence. *See Sanchez v. State*, 165 S.W.3d 707, 710 (Tex. Crim. App. 2005) (explaining purpose of voir dire).

The State's opening argument shed some light on its theory of the case. The State told the jury Collier was a member of the Brotherhood and had struck a deal with the State. The State wanted the jury to know "why he did what he did" and why appellant, "a ranking member in the Aryan Brotherhood, was directing everybody what to do." However, the State also emphasized appellant's role, which included using a drill on Gonzalez's head and ordering disposal of the body. The State encouraged the jury to not only rely on Collier's and Shelvie's testimony, but also to pay close attention to appellant's four-hour police interview.

During its case-in-chief, the State presented horrific, detailed evidence of how Gonzalez endured hours of torture. The jury heard testimony regarding appellant's direct involvement in the murder. Shelvie testified she heard appellant in the kitchen say "they're going to have to finish him, not let him walk out of there." She witnessed appellant drill holes in Gonzalez's skull, chest, and abdomen. She later heard appellant say he "stuck a broom handle up his a\*\*." Collier witnessed appellant use the blunt side of a machete to hit Gonzalez's arm.

Dr. Schoppe's examination and findings during the autopsy indicated Gonzalez received stab wounds consistent with Shelvie's testimony about the drill. Dr. Schoppe testified the penetrating wounds to the chest, if left untreated, could be fatal. The penetrating defect to the temple that went into Gonzalez's brain stem "most likely" would have been fatal. She also explained that fecal matter forced into the abdomen area through perforated intestines would lead to a life-threatening infection. She testified each one of these injuries could have been independently fatal on its own and any one of them could have been the cause of death. Thus, the jury heard graphic evidence, viewed in the light most favorable to the verdict, that appellant caused Gonzalez's death. *See, e.g., Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008)

–11–

(concluding admission of evidence harmless in light of overwhelming evidence of guilt shown by other evidence).

Finally, the jury heard appellant admit to his participation in the torture during his police interview. He said he gave Gonzalez an "a\*\* whooping." He changed his story several times throughout the interview regarding his participation and what he saw but the longer he talked to detectives, the more information he provided that confirmed what officers already knew based on their investigation and the autopsy report. Importantly, the jury heard appellant agree that he participated in the murder "to a certain degree."

Although the State discussed the Brotherhood during its closing argument and how gangs "operate out on the street because of fear," it also highlighted the gruesome nature of the torture and explained how the jury could find appellant guilty as a principal, party, or as a conspirator. Defense counsel downplayed appellant's role as someone in control and described him as the "old guy" and someone no longer a "prime mover" in "whatever organization." Defense counsel challenged the credibility of the other witnesses and the police investigation. He argued that after officers interviewed appellant, they developed "tunnel vision . . . confirmation bias." He asserted the other witnesses had a "vested interest in making sure that everything fell on top of Mike Rogers, the Aryan Brotherhood member that's facing a murder charge" instead of interviewing other key players present during the murder.

He argued there was no evidence appellant intended to kill Gonzalez. He emphasized the State hung their case on the testimony of Collier and Shelvie, which was not enough, "especially when Greg Collier was a piece of garbage before this case started, before this murder happened." He recognized the jury could have nothing but "resentment and loathing towards" appellant for what he had done with his life but that did not mean the jury should convict him of a crime. During

rebuttal, the prosecutor argued the jury could disbelieve Collier and Shelvie and still find appellant guilty based on his interview in which he admitted to being part of the torture.

Although the jury heard numerous references throughout trial to the Brotherhood, we cannot conclude appellant suffered harm affecting his substantial rights to a fair trial. *See* TEX. R. APP. P. 44.2(b). Having reviewed the entire record, giving consideration to voir dire, the testimony, physical evidence, jury instructions, theories of the case, and closing arguments, we have fair assurance that evidence regarding the Brotherhood did not influence the jury or had but slight effect. *See Schmutz*, 440 S.W.3d at 39*; see also Neal*, 256 S.W.3d at 285. We overrule appellant's first issue.

### Challenges for Cause During Jury Selection

In his remaining issues, appellant argues six jurors were improperly struck for cause as a result of the State and the trial court misstating the law of capital murder and transferred intent. The State responds appellant failed to preserve his issues for review and affirmatively waived his complaints. Alternatively, even if he preserved the issues, neither the State nor the trial court misstated the law.

To preserve a complaint for review, the complaining party is required to make a timely request, objection, or motion to the trial court. *See* TEX. R. APP. P. 33.1(a)(1). Appellant contends the contemporaneous-objection rule does not apply to a misstatement of law because "[s]ome rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system." He cites *Proenza v. State*, 541 S.W.3d 786 (Tex. Crim. App. 2017) to support his position but provides no legal analysis.

In *Proenza*, the court of criminal appeals held a defendant did not have to timely object to preserve a complaint that the trial court improperly commented on the weight of the evidence. *Id.* at 801. Here, appellant argues the State and the trial court misstated the law; not that they

commented on the weight of the evidence. Misstatements of law by the trial court or the State during voir dire require an objection at the time the alleged misstatement occurs to preserve the issue for appellate review. *See, e.g., Carter v. State*, No. 03-03-00028-CR, 2004 WL 792114, at *2 (Tex. App.—Austin Apr. 15, 2004, no pet.) (mem. op., not designated for publication) (statement by trial court); *Salinas v. State*, No. 07-00-0093-CR, 2002 WL 1870249, at *4 (Tex. App.—Amarillo Aug. 12, 2002, pet. ref'd) (not designated for publication) (statement by prosecutor). Further, regardless of whether appellant needed to object to preserve his issues, he forfeited his complaints when defense counsel affirmatively stated "no objection" to the striking of all six jurors. *See Norton v. State*, No. 05-98-01400-CR, 2000 WL 424283, at *2 (Tex. App.—Dallas Apr. 20, 2000, pet. ref'd) (waiving voir dire complaints by affirmatively endorsing jury despite earlier objections) (not designated for publication). We overrule appellant's remaining six issues.

### Reformation of Judgment

While reviewing the judgment, we observed two errors. The judgment states punishment was assessed by the jury rather than the trial court, and it states, "N/A" under "Finding on Deadly Weapon." The parties do not address this on appeal, but we may sua sponte reform the judgment when we have the necessary information to do so. *Asberry v. State*, 813 S.W.2d 526, 530 (Tex. App.—Dallas 1991 pet. ref'd).

Accordingly, the judgment should be reformed to reflect the trial court assessed punishment rather than the jury. *See, e.g., Martinez v. State*, No. 14-10-00552-CR, 2011 WL 1601313, at *3 (Tex. App.—Houston [14th Dist.] Apr. 26, 2011, no pet.) (mem. op., not designated for publication) (reforming judgment to correct judge, rather than jury, assessed punishment). The judgment should be further modified to include a deadly weapon finding. The indictment alleged appellant inflicted homicidal violence "including stab wounds, and blunt force injuries, and

thermal burns, with a sharp object, a deadly weapon, and a hand, a deadly weapon, and a drill, a deadly weapon, and a hammer, a deadly weapon, and a broom stick, a deadly weapon, and a machete, a deadly weapon, and an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury." The jury found him "GUILTY of capital murder as charged in the indictment." Thus, the jury made an affirmative deadly weapon finding, and we modify the judgment to reflect the finding. *Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016); *see also Caballero v. State*, No. 05-18-01338-CR, 2019 WL 5112270, at *1 (Tex. App.—Dallas Oct. 10, 2019, no pet.) (mem. op., not designated for publication).

## Conclusion

As modified, the judgment of the trial court is affirmed.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180724F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL LYNN ROGERS, Appellant

No. 05-18-00724-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1800263-T.
Opinion delivered by Justice Bridges.
Justices Whitehill and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Under Findings on a Deadly Weapon, we **DELETE** "N/A" and **REPLACE** with "Yes."

Under "Punishment Assessed by," we **DELETE** "Jury" and **REPLACE** with "Trial Court."

As modified, the judgment of the trial court is **AFFIRMED**.

Judgment entered December 5, 2019