02-11-414-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00414-CR

 

 


 
 
 David
 Jackson
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 371st District
 Court
  
 of
 Tarrant County (1214981D)
  
 December
 6, 2012
  
 Opinion
 by Chief Justice Livingston
  
 (nfp)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

 

By_________________________________

 

   
Chief Justice Terrie Livingston

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00414-CR

 

 


 
 
 David Jackson
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 371st
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

          In
one point, appellant David Jackson appeals his conviction for capital murder.[2] 
We affirm.

Background Facts

          Latressa
Campbell and Toby Lightfoot dated each other for over three years.  During part
of that time, Campbell and Lightfoot lived with Shirley Sanchez, Campbell’s mother,
in a Fort Worth apartment.  Sanchez has an extensive criminal record and has
used several different names and birthdays in her contacts with the police.

          According
to Sanchez, in December 2009, Campbell and Lightfoot got “mad at each other,”
so Lightfoot moved out of the apartment.  Campbell and Sanchez moved to a new
address in April 2010.  Around that same time, Campbell began dating appellant. 
Appellant and Campbell often argued with each other.  Sanchez saw appellant
daily, and appellant occasionally stayed overnight with Sanchez and Campbell.  But
according to Sanchez, sometime between April 2010 and July 2010, Campbell
became angry with appellant and broke up with him.

          Around
June or July 2010, Lightfoot resumed his relationship with Campbell, and he and
his young daughter moved back in with Campbell and Sanchez.  Sometime after
that, appellant, who drove a yellow van that had once been a taxi, went to a
restaurant where Campbell worked.[3]  Sanchez, Lightfoot, and
Lightfoot’s daughter were having dinner there.  Sanchez went outside the
restaurant and had a discussion with appellant about his prior relationship
with Campbell.  Sanchez told appellant that Campbell did not “want [him]”
anymore and advised appellant to leave Campbell alone.

          One
morning in September 2010, Campbell, Lightfoot, and Lightfoot’s daughter walked
out of Sanchez’s house so that Campbell could take Lightfoot to work.  Sanchez,
who had remained in the residence, heard several gunshots, ran to the window in
Campbell’s room, and saw appellant, who was about six or seven feet away from
the window and was “standing over [Campbell and Lightfoot] . . . with the gun
still in his hand.”[4]  Sanchez also saw appellant’s
yellow van, which was blocking Campbell’s car from exiting the driveway.  Sanchez
ran out of the house and saw Campbell and Lightfoot lying in the yard. 
Campbell and Lightfoot died there from their gunshot wounds.

          Charles
Bright, who was installing internet service at a residence near Sanchez’s house
that morning, saw the shooting, ran to the scene, and took Lightfoot’s child
out of a car.  Bright noticed that the shooter was a black man, but Bright was
not able to get a good enough look at the shooter’s face to identify him.  Bright
did not see a yellow van during the shooting.

          Felicia
Sparkman lived near Sanchez’s house and had just returned from grocery shopping
when the shooting occurred.  Before the shooting, Sparkman saw a yellow van
pass by her house.  After hearing gunshots, Sparkman noticed that a woman was
screaming at the house where the shooting had occurred.  In the driveway
of that same house, Sparkman saw a black man who was wearing a white shirt enter
a yellow van, and she watched that van as it drove away.  Sparkman went to the
house where the woman was screaming, and Sparkman heard the woman repeatedly
say, “I know who did it.”

          Mario
Espinosa also lived near Sanchez.  On the morning of the shooting, Espinosa saw
a “yellow colored van like a cab” drive to Sanchez’s house.[5] 
Espinosa watched a black man step out of the van, fire several shots, and get
back into the van.  Espinosa called 911 and ran to the scene of the crime.  Espinosa
heard Sanchez say that appellant was the shooter.

          A
dispatcher sent Fort Worth Police Department (FWPD) Officer Clyde Williams to
the scene.  When Officer Williams arrived, Sanchez was visibly upset and was
crying, but after she calmed down, she told Officer Williams that appellant had
killed Campbell and Lightfoot.  Sanchez also said that appellant was in a
“yellow cab-like van,” and Officer Williams relayed this information to other
officers.  Sanchez later told another officer that appellant was the gunman.

          FWPD
Officer Ruben Hernandez, who was working as a traffic officer on the day of the
shooting, received information about the shooting and was advised to watch for
a yellow van that was once a taxi.  While Officer Hernandez was writing a
ticket, he saw a yellow van being driven by a black man who was wearing a white
shirt and was not wearing his seat belt, and Officer Hernandez noticed that the
van had “the ghost markings of what used to . . . say yellow cab on it.”  Officer
Hernandez got onto his motorcycle, began following the van, and eventually
initiated a traffic stop of it.  The van temporarily stopped, but when Officer
Hernandez approached, it sped off.  Officer Hernandez returned to his
motorcycle and began following the van again.  After being pursued at a high
speed by Officer Hernandez for a few minutes through a residential neighborhood,
the driver of the van stopped, jumped out, and began running between some
houses.  The van continued rolling and struck a parked car.

          The
van’s driver was eventually caught by FWPD Officer Martin Chazarreta in someone’s
backyard.  When Officer Chazarreta saw the driver, he ordered him to the
ground, but the driver refused and instead walked toward the officer.  When the
driver got close to Officer Chazaretta, the officer kicked the driver, causing
him to fall to the ground.  The driver eventually identified himself as
appellant.  A test of materials taken from one of appellant’s hands after his
arrest revealed the presence of barium, lead, and antimony, which are commonly
associated with gunshot primer residue.

          A
grand jury indicted appellant with capital murder, alleging that he had
intentionally caused the death of Campbell and Lightfoot in the same criminal
transaction.[6]  Before trial, the State
filed a notice of its intent to introduce evidence that in late May 2010,
appellant had “displayed [a] gun to [Campbell] when he was mad because she
wouldn’t take him home.”

          Appellant
pled not guilty.  After the jury heard evidence and arguments from the parties,
it convicted appellant of capital murder.  The trial court sentenced him to
life imprisonment without the possibility of parole.[7] 
He brought this appeal.

The
Admission of Evidence Concerning Appellant’s Extraneous Act

          In
his only point, appellant contends that the trial court abused its discretion
by allowing testimony concerning an extraneous act that he committed.  During
Sanchez’s testimony, the trial court held a hearing outside of the jury’s
presence about the admissibility of evidence concerning an incident that
occurred one early morning in May 2010, four months before Campbell and
Lightfoot were murdered.  In the hearing, Sanchez testified that in May 2010, Campbell
and appellant had an argument about appellant’s prolonged use of Campbell’s
car.  Appellant brought the car to Sanchez’s house, but while having a gun
tucked in his waist band, he commanded Campbell to get out of bed and to take
him home.  Campbell got out of bed and told appellant to go wait in the car. 
About that same time, Sanchez saw appellant holding the gun by his side.  Sanchez
thought that appellant might kill her and Campbell.  She asked appellant what
he was going to do with the gun, and appellant said that he was not going to do
anything with it.  After appellant went outside the house, Campbell locked the
door to the house from the inside, and Sanchez called 911.            The State
contended that Sanchez’s testimony about the May 2010 incident was admissible
to show the “relationship between the parties,” but appellant objected to the
evidence on the grounds that it was an inadmissible extraneous offense and was
more prejudicial than probative.  The trial court admitted the evidence, and
Sanchez testified about the same facts in front of the jury.

          We
review a trial court’s decision to admit evidence for an abuse of discretion.  See
Lozano v. State, 359 S.W.3d 790, 817 (Tex. App.—Fort Worth 2012, pet. ref’d)
(explaining that a trial court does not abuse its discretion unless its “determination
lies outside the zone of reasonable disagreement”).  We must uphold the
admission of evidence if it is correct under any theory of law applicable to
the case.  Bowley v. State, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010); James
v. State, 335 S.W.3d 719, 723 (Tex. App.—Fort Worth 2011, no pet.).

          Article
38.36 of the code of criminal procedure states that in murder cases, the State
may “offer testimony as to all relevant facts and circumstances surrounding the
killing and the previous relationship existing between the accused and the
deceased, together with all relevant facts and circumstances going to show the
condition of the mind of the accused at the time of the offense.”  Tex. Code
Crim. Proc. Ann. art. 38.36(a) (West 2005); Garcia v. State, 201 S.W.3d
695, 702 (Tex. Crim. App. 2006), cert. denied, 549 US. 1224 (2007). 
Evidence of prior acts of violence by the defendant, even if offered under
article 38.36 in a murder case, must be admissible under rules of evidence 403
and 404(b).  See Garcia, 201 S.W.3d at 702–03 (stating that rules 403
and 404(b) “limit the admissibility of some [a]rticle 38.36(a) relationship
evidence”); Smith v. State, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999). 
Rule 403 states that relevant evidence may be excluded if its “probative value
is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence.”  Tex. R. Evid. 403.  Rule 404(b)
provides that evidence of extraneous crimes or acts is “not admissible to prove
the character of a person in order to show action in conformity therewith.  It
may, however, be admissible for other purposes, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of
mistake or accident . . . .”  Tex. R. Evid. 404(b).

          Appellant
contends that the State presented the evidence about the May 2010 incident for
the prohibited purpose of showing that on the day of the murder, appellant
acted in conformity with his generally bad character.  In Foy v. State,
the court of criminal appeals considered whether, in a prosecution for arson of
a house, the State could present evidence of prior acts by the defendant,
including that three weeks prior to the arson, the same defendant threatened
the same victims by pointing a pistol at them.  593 S.W.2d 707, 708 (Tex. Crim.
App. [Panel Op.] 1980).  The court held that this evidence was admissible,
explaining in part,

[T]he evidence of prior misconduct introduced against
appellant showed acts committed against the persons who were the victims of the
offense charged.  Certainly, these prior violent acts indicated the existence
of hostility or ill will on the part of appellant toward the victims of the
offense charged.  Under these circumstances, the evidence of prior extraneous
offenses should be admissible as circumstantial evidence of the existence of a
motive for committing the offense charged.[[8]]  In the situation
presented here, rather than say that the extraneous offense evidence was
circumstantial evidence “that would cause or produce the emotion” known as
motive, it would be more accurate to say that the evidence circumstantially [r]eflected
the existence of the emotion. . . .  In short, we hold that
evidence of prior extraneous offenses committed against the victim of the
offense charged, and indicating the existence of ill will or hostility toward
the victim, is admissible as part of the State’s case in chief as
circumstantial evidence of the existence of a motive for committing the offense
charged.

Foy,
593 S.W.2d at 709 (emphasis added); see also Brandley v. State, 691
S.W.2d 699, 706 (Tex. Crim. App. 1985) (“[E]xtraneous transactions directed
specifically toward a certain individual . . . can be relevant and
admissible to show motive.”).  Several courts of appeals, including our own
court, have followed the rationale expressed in Foy to hold that
evidence of prior extraneous offenses committed by the defendant against the
victim of the charged offense are admissible to show the defendant’s ill will
or hostility toward the victim and to therefore establish motive.  See Brock
v. State, 275 S.W.3d 586, 589–90 (Tex. App.—Amarillo 2008, pet. ref’d); Bisby
v. State, 907 S.W.2d 949, 959 (Tex. App.—Fort Worth 1995, pet. ref’d) (“We
conclude that the evidence of prior acts committed by appellant . . .
show [his] ill will or hostility toward [the victim].  Therefore, the [evidence
was] admissible as circumstantial evidence of the existence of a motive for
appellant to commit the offense charged.”) (citation omitted); Page v. State,
819 S.W.2d 883, 887 (Tex. App.—Houston [14th Dist.] 1991, pet. ref’d).

          The
trial court could have reasonably concluded that appellant’s prior act of
pulling out a gun during an early morning disagreement with Campbell indicated
the existence of his hostility or ill will toward her and his motive to later kill
her.  Thus, under the rationale expressed in the cases cited above, we conclude
that the trial court did not abuse its discretion by, under article 38.36 of
the code of criminal procedure and rule of evidence 404(b), admitting Sanchez’s
testimony about the May 2010 incident.  See Foy, 593 S.W.2d at 708–09; see
also Hall v. State, 640 S.W.2d 307, 309 (Tex. Crim. App. 1982) (holding
that evidence of previous threats from the defendant to the victim and of a
previous altercation between them was admissible to show “circumstances
surrounding the attempted killing” and the relationship between the parties).

          Next,
while appellant does not cite rule of evidence 403 in his brief, he seems to
assert that evidence of the May 2010 incident was inadmissible under that rule
because there was “no evidence that during the described event . . . the
deceased was threatened.”  But the cases cited above allow admission of prior
extraneous acts between the defendant and the victim to show the defendant’s
ill will, hostility, and motive, not the victim’s apprehension of those
characteristics.  In his brief, appellant does not specify why he believes that
evidence of the May 2010 incident was unfairly prejudicial.  Applying the
appropriate balancing factors under rule 403, we hold that the trial court did
not abuse its discretion by overruling appellant’s objection under that rule
and by following the presumption of admitting relevant evidence.  See
Tex. R. Evid. 403; Price v. State, 351 S.W.3d 148, 153–54 (Tex. App.—Fort
Worth 2011, pet. ref’d).

Finally,
even if we were to conclude that the trial court abused its discretion by
admitting the evidence concerning appellant’s prior act of displaying the gun,
we would be required to assess whether harm resulted from that error.  See
Tex. R. App. P. 44.2(b).  The wrongful admission of evidence concerning an
extraneous offense is nonconstitutional error.  Pittman v. State, 321
S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2010, no pet.); Coleman v.
State, 188 S.W.3d 708, 726 (Tex. App.—Tyler 2005, pet. ref’d), cert.
denied, 549 U.S. 999 (2006).  A nonconstitutional error that “does not
affect substantial rights must be disregarded.”  Tex. R. App. P. 44.2(b).  A
substantial right is affected when the error had a substantial and injurious
effect or influence in determining the jury’s verdict.  King v. State,
953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United
States, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  Conversely, an
error does not affect a substantial right if we have a “fair assurance that the
error did not influence the jury, or had but a slight effect.”  Solomon v.
State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); Johnson v. State,
967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  In making this determination, we
review the record as a whole, including any testimony or physical evidence
admitted for the jury’s consideration, the nature of the evidence supporting
the verdict, and the character of the alleged error and how it might be considered
in connection with other evidence in the case.  Motilla v. State, 78
S.W.3d 352, 355 (Tex. Crim. App. 2002).  We may also consider the jury
instructions, the State’s theory and any defensive theories, whether the State
emphasized the error, closing arguments, and even voir dire, if applicable.  Id.
at 355–56.

Appellant
contends that the trial court’s alleged error was “extremely harmful in that an
extraneous firearm offense involving the same person as he was on trial for
murdering was admitted.”  But apart from the testimony of appellant’s
extraneous act, the evidence of appellant’s guilt was substantial and
uncontroverted.  The combined testimony from the State’s witnesses established,
among other facts, that appellant had been stalking Campbell; that they had a
history of fighting; that appellant had previously driven a yellow van before
the morning of the shooting; that a yellow van pulled up to where Campbell and
Lightfoot were staying on the morning of the shooting; that Sanchez and other
witnesses heard gunshots; that Sanchez saw appellant standing over Campbell and
Lightfoot with a gun in his hand; that just after the shooting and while
Sanchez was still in an emotional state, she almost immediately told multiple
people that appellant was the gunman; that a black man with a white shirt drove
a yellow van away from the scene of the crime; that officers saw appellant, who
was wearing a white shirt, driving a yellow van near the area of the crime;
that appellant evaded officers in the van (at a high speed and while running
multiple stop signs) and on foot; that appellant resisted arrest when an
officer found him hiding in the backyard of a home; and that at the time of the
arrest, appellant had materials consistent with gunshot primer residue on his
hand.

Sanchez
testified that from about six or seven feet away, she saw appellant standing
over the victims with a gun in his hand.  In his closing argument, appellant’s
counsel attempted to persuade the jury to conclude that Sanchez was not
credible because of her history of committing crimes and “telling people things
in a position of authority . . . that were not true in
order to protect herself.”  However, if based on Sanchez’s history, jurors were
prone to find her not credible and to disbelieve her unambiguous,
uncontroverted account of the shooting, they would not have been likely to nonetheless
convict appellant based upon her other testimony about appellant’s extraneous
act.  Conversely, if the jurors were prone to find Sanchez’s testimony credible,
they could have convicted appellant based on her other testimony about the
shooting without considering her testimony about appellant’s prior act with the
gun.

          The
State’s development of evidence in front of the jury about appellant’s
extraneous act spans only six pages of a reporter’s record that includes more
than four hundred pages of testimony.  The State did not refer to the
extraneous act in its opening statement or in its closing argument.  Also, although
appellant argues on appeal that the extraneous act “was character conformity
evidence, and not relationship of the parties evidence,” in the jury charge,
the trial court instructed the jury that it could consider an extraneous
offense for the purpose of determining the “previous relationship existing
between the accused and the deceased and/or the motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident of
[appellant], if any, in connection with the offense, if any, alleged against
him in the Indictment . . . and for no other purpose.”  We
presume that the jury followed this instruction.  See Hutch v. State,
922 S.W.2d 166, 170 (Tex. Crim. App. 1996) (“[A]bsent evidence to the contrary,
we presume the jury followed the law provided by the charge.”); Karnes v.
State, 127 S.W.3d 184, 196 (Tex. App.—Fort Worth 2003, pet. ref’d).

          For
these reasons, we conclude that even if the trial court had abused its
discretion by admitting evidence about appellant’s prior act with a gun, the
trial court’s ruling did not substantially and injuriously affect the jury’s
verdict, and it was therefore not harmful.  See Tex. R. App. P. 44.2(b);
King, 953 S.W.2d at 271.

          Because
we conclude that neither error nor harm occurred in the trial court with
respect to the admission of evidence about the May 2010 incident, we overrule
appellant’s sole point.

Conclusion

          Having
overruled appellant’s point, we affirm the trial court’s judgment.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App.
P. 47.2(b)

 

DELIVERED:
 December 6, 2012









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Penal Code
Ann. § 19.03(a)(7)(A) (West Supp. 2012).





[3]Sanchez testified that
although the van had been lightly painted on its side, she could still “read and
know that it had been a taxi.”





[4]Sanchez testified that
there was “no doubt” in her mind that appellant was the person who shot
Campbell and Lightfoot.





[5]Espinosa gave a
description of the van he saw that is different than the van appellant drove. 
But Espinosa also testified that he had tried to forget about what he had seen
on the day of the shooting.





[6]See id.





[7]See id. §
12.31(a)(2) (West 2011).





[8]“Evidence of motive is
always admissible because it is relevant as a circumstance tending to prove the
commission of an offense.”  Cox v. State, 931 S.W.2d 349, 353 (Tex.
App.—Fort Worth 1996), pet. dism’d, improvidently granted, 951 S.W.2d 5
(Tex. Crim. App. 1997).