

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00414-CR

| | | |
|---|---|---|
| David Jackson | § | From the 371st District Court |
| | § | of Tarrant County (1214981D) |
| v. | § | December 6, 2012 |
| | § | Opinion by Chief Justice Livingston |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____

Chief Justice Terrie Livingston


DAVID JACKSON                                                         APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In one point, appellant David Jackson appeals his conviction for capital murder.[2]  We affirm.

### Background Facts

Latressa Campbell and Toby Lightfoot dated each other for over three years.  During part of that time, Campbell and Lightfoot lived with Shirley

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. § 19.03(a)(7)(A) (West Supp. 2012).

Sanchez, Campbell's mother, in a Fort Worth apartment. Sanchez has an extensive criminal record and has used several different names and birthdays in her contacts with the police.

According to Sanchez, in December 2009, Campbell and Lightfoot got "mad at each other," so Lightfoot moved out of the apartment. Campbell and Sanchez moved to a new address in April 2010. Around that same time, Campbell began dating appellant. Appellant and Campbell often argued with each other. Sanchez saw appellant daily, and appellant occasionally stayed overnight with Sanchez and Campbell. But according to Sanchez, sometime between April 2010 and July 2010, Campbell became angry with appellant and broke up with him.

Around June or July 2010, Lightfoot resumed his relationship with Campbell, and he and his young daughter moved back in with Campbell and Sanchez. Sometime after that, appellant, who drove a yellow van that had once been a taxi, went to a restaurant where Campbell worked.[3] Sanchez, Lightfoot, and Lightfoot's daughter were having dinner there. Sanchez went outside the restaurant and had a discussion with appellant about his prior relationship with Campbell. Sanchez told appellant that Campbell did not "want [him]" anymore and advised appellant to leave Campbell alone.

---

[3]Sanchez testified that although the van had been lightly painted on its side, she could still "read and know that it had been a taxi."

3

One morning in September 2010, Campbell, Lightfoot, and Lightfoot's daughter walked out of Sanchez's house so that Campbell could take Lightfoot to work. Sanchez, who had remained in the residence, heard several gunshots, ran to the window in Campbell's room, and saw appellant, who was about six or seven feet away from the window and was "standing over [Campbell and Lightfoot] . . . with the gun still in his hand."[4] Sanchez also saw appellant's yellow van, which was blocking Campbell's car from exiting the driveway. Sanchez ran out of the house and saw Campbell and Lightfoot lying in the yard. Campbell and Lightfoot died there from their gunshot wounds.

Charles Bright, who was installing internet service at a residence near Sanchez's house that morning, saw the shooting, ran to the scene, and took Lightfoot's child out of a car. Bright noticed that the shooter was a black man, but Bright was not able to get a good enough look at the shooter's face to identify him. Bright did not see a yellow van during the shooting.

Felicia Sparkman lived near Sanchez's house and had just returned from grocery shopping when the shooting occurred. Before the shooting, Sparkman saw a yellow van pass by her house. After hearing gunshots, Sparkman noticed that a woman was screaming at the house where the shooting had occurred. In the driveway of that same house, Sparkman saw a black man who was wearing a white shirt enter a yellow van, and she watched that van as it drove

_____

[4]Sanchez testified that there was "no doubt" in her mind that appellant was the person who shot Campbell and Lightfoot.

4

away. Sparkman went to the house where the woman was screaming, and Sparkman heard the woman repeatedly say, "I know who did it."

Mario Espinosa also lived near Sanchez. On the morning of the shooting, Espinosa saw a "yellow colored van like a cab" drive to Sanchez's house.[5] Espinosa watched a black man step out of the van, fire several shots, and get back into the van. Espinosa called 911 and ran to the scene of the crime. Espinosa heard Sanchez say that appellant was the shooter.

A dispatcher sent Fort Worth Police Department (FWPD) Officer Clyde Williams to the scene. When Officer Williams arrived, Sanchez was visibly upset and was crying, but after she calmed down, she told Officer Williams that appellant had killed Campbell and Lightfoot. Sanchez also said that appellant was in a "yellow cab-like van," and Officer Williams relayed this information to other officers. Sanchez later told another officer that appellant was the gunman.

FWPD Officer Ruben Hernandez, who was working as a traffic officer on the day of the shooting, received information about the shooting and was advised to watch for a yellow van that was once a taxi. While Officer Hernandez was writing a ticket, he saw a yellow van being driven by a black man who was wearing a white shirt and was not wearing his seat belt, and Officer Hernandez noticed that the van had "the ghost markings of what used to . . . say yellow cab

---

[5]Espinosa gave a description of the van he saw that is different than the van appellant drove. But Espinosa also testified that he had tried to forget about what he had seen on the day of the shooting.

5

on it." Officer Hernandez got onto his motorcycle, began following the van, and eventually initiated a traffic stop of it. The van temporarily stopped, but when Officer Hernandez approached, it sped off. Officer Hernandez returned to his motorcycle and began following the van again. After being pursued at a high speed by Officer Hernandez for a few minutes through a residential neighborhood, the driver of the van stopped, jumped out, and began running between some houses. The van continued rolling and struck a parked car.

The van's driver was eventually caught by FWPD Officer Martin Chazarreta in someone's backyard. When Officer Chazarreta saw the driver, he ordered him to the ground, but the driver refused and instead walked toward the officer. When the driver got close to Officer Chazaretta, the officer kicked the driver, causing him to fall to the ground. The driver eventually identified himself as appellant. A test of materials taken from one of appellant's hands after his arrest revealed the presence of barium, lead, and antimony, which are commonly associated with gunshot primer residue.

A grand jury indicted appellant with capital murder, alleging that he had intentionally caused the death of Campbell and Lightfoot in the same criminal transaction.[6] Before trial, the State filed a notice of its intent to introduce evidence that in late May 2010, appellant had "displayed [a] gun to [Campbell] when he was mad because she wouldn't take him home."

---

[6] See id.

Appellant pled not guilty. After the jury heard evidence and arguments from the parties, it convicted appellant of capital murder. The trial court sentenced him to life imprisonment without the possibility of parole.[7] He brought this appeal.

**The Admission of Evidence Concerning Appellant's Extraneous Act**

In his only point, appellant contends that the trial court abused its discretion by allowing testimony concerning an extraneous act that he committed. During Sanchez's testimony, the trial court held a hearing outside of the jury's presence about the admissibility of evidence concerning an incident that occurred one early morning in May 2010, four months before Campbell and Lightfoot were murdered. In the hearing, Sanchez testified that in May 2010, Campbell and appellant had an argument about appellant's prolonged use of Campbell's car. Appellant brought the car to Sanchez's house, but while having a gun tucked in his waist band, he commanded Campbell to get out of bed and to take him home. Campbell got out of bed and told appellant to go wait in the car. About that same time, Sanchez saw appellant holding the gun by his side. Sanchez thought that appellant might kill her and Campbell. She asked appellant what he was going to do with the gun, and appellant said that he was not going to do anything with it. After appellant went outside the house, Campbell locked the door to the house from the inside, and Sanchez called 911.

[7]*See id.* § 12.31(a)(2) (West 2011).

The State contended that Sanchez's testimony about the May 2010 incident was admissible to show the "relationship between the parties," but appellant objected to the evidence on the grounds that it was an inadmissible extraneous offense and was more prejudicial than probative. The trial court admitted the evidence, and Sanchez testified about the same facts in front of the jury.

We review a trial court's decision to admit evidence for an abuse of discretion. *See Lozano v. State*, 359 S.W.3d 790, 817 (Tex. App.—Fort Worth 2012, pet. ref'd) (explaining that a trial court does not abuse its discretion unless its "determination lies outside the zone of reasonable disagreement"). We must uphold the admission of evidence if it is correct under any theory of law applicable to the case. *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010); *James v. State*, 335 S.W.3d 719, 723 (Tex. App.—Fort Worth 2011, no pet.).

Article 38.36 of the code of criminal procedure states that in murder cases, the State may "offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2005); *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006), *cert. denied*, 549 US. 1224 (2007). Evidence of prior acts of violence by the defendant, even if offered under article

38.36 in a murder case, must be admissible under rules of evidence 403 and 404(b). *See Garcia*, 201 S.W.3d at 702–03 (stating that rules 403 and 404(b) "limit the admissibility of some [a]rticle 38.36(a) relationship evidence"); *Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999). Rule 403 states that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Rule 404(b) provides that evidence of extraneous crimes or acts is "not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Tex. R. Evid. 404(b).

Appellant contends that the State presented the evidence about the May 2010 incident for the prohibited purpose of showing that on the day of the murder, appellant acted in conformity with his generally bad character. In *Foy v. State*, the court of criminal appeals considered whether, in a prosecution for arson of a house, the State could present evidence of prior acts by the defendant, including that three weeks prior to the arson, the same defendant threatened the same victims by pointing a pistol at them. 593 S.W.2d 707, 708 (Tex. Crim. App. [Panel Op.] 1980). The court held that this evidence was admissible, explaining in part,

9

> [T]he evidence of prior misconduct introduced against appellant showed acts committed against the persons who were the victims of the offense charged. Certainly, these prior violent acts indicated the existence of hostility or ill will on the part of appellant toward the victims of the offense charged. Under these circumstances, the evidence of prior extraneous offenses should be admissible as circumstantial evidence of the existence of a motive for committing the offense charged.[8] In the situation presented here, rather than say that the extraneous offense evidence was circumstantial evidence "that would cause or produce the emotion" known as motive, it would be more accurate to say that the evidence circumstantially [r]eflected the existence of the emotion. . . . *In short, we hold that evidence of prior extraneous offenses committed against the victim of the offense charged, and indicating the existence of ill will or hostility toward the victim, is admissible as part of the State's case in chief as circumstantial evidence of the existence of a motive for committing the offense charged.*

*Foy*, 593 S.W.2d at 709 (emphasis added); *see also Brandley v. State*, 691 S.W.2d 699, 706 (Tex. Crim. App. 1985) ("[E]xtraneous transactions directed specifically toward a certain individual . . . can be relevant and admissible to show motive."). Several courts of appeals, including our own court, have followed the rationale expressed in *Foy* to hold that evidence of prior extraneous offenses committed by the defendant against the victim of the charged offense are admissible to show the defendant's ill will or hostility toward the victim and to therefore establish motive. *See Brock v. State*, 275 S.W.3d 586, 589–90 (Tex. App.—Amarillo 2008, pet. ref'd); *Bisby v. State*, 907 S.W.2d 949, 959 (Tex. App.—Fort Worth 1995, pet. ref'd) ("We conclude that the evidence of prior acts

---

[8]"Evidence of motive is always admissible because it is relevant as a circumstance tending to prove the commission of an offense." *Cox v. State*, 931 S.W.2d 349, 353 (Tex. App.—Fort Worth 1996), *pet. dism'd, improvidently granted*, 951 S.W.2d 5 (Tex. Crim. App. 1997).

committed by appellant . . . show [his] ill will or hostility toward [the victim]. Therefore, the [evidence was] admissible as circumstantial evidence of the existence of a motive for appellant to commit the offense charged.") (citation omitted); *Page v. State*, 819 S.W.2d 883, 887 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd).

The trial court could have reasonably concluded that appellant's prior act of pulling out a gun during an early morning disagreement with Campbell indicated the existence of his hostility or ill will toward her and his motive to later kill her. Thus, under the rationale expressed in the cases cited above, we conclude that the trial court did not abuse its discretion by, under article 38.36 of the code of criminal procedure and rule of evidence 404(b), admitting Sanchez's testimony about the May 2010 incident. *See Foy*, 593 S.W.2d at 708–09; *see also Hall v. State*, 640 S.W.2d 307, 309 (Tex. Crim. App. 1982) (holding that evidence of previous threats from the defendant to the victim and of a previous altercation between them was admissible to show "circumstances surrounding the attempted killing" and the relationship between the parties).

Next, while appellant does not cite rule of evidence 403 in his brief, he seems to assert that evidence of the May 2010 incident was inadmissible under that rule because there was "no evidence that during the described event . . . the deceased was threatened." But the cases cited above allow admission of prior extraneous acts between the defendant and the victim to show the defendant's ill will, hostility, and motive, not the victim's apprehension of those characteristics.

11

In his brief, appellant does not specify why he believes that evidence of the May 2010 incident was unfairly prejudicial. Applying the appropriate balancing factors under rule 403, we hold that the trial court did not abuse its discretion by overruling appellant's objection under that rule and by following the presumption of admitting relevant evidence. *See* Tex. R. Evid. 403; *Price v. State*, 351 S.W.3d 148, 153–54 (Tex. App.—Fort Worth 2011, pet. ref'd).

Finally, even if we were to conclude that the trial court abused its discretion by admitting the evidence concerning appellant's prior act of displaying the gun, we would be required to assess whether harm resulted from that error. *See* Tex. R. App. P. 44.2(b). The wrongful admission of evidence concerning an extraneous offense is nonconstitutional error. *Pittman v. State*, 321 S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Coleman v. State*, 188 S.W.3d 708, 726 (Tex. App.—Tyler 2005, pet. ref'd), *cert. denied*, 549 U.S. 999 (2006). A nonconstitutional error that "does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have a "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In making this determination, we

12

review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

Appellant contends that the trial court's alleged error was "extremely harmful in that an extraneous firearm offense involving the same person as he was on trial for murdering was admitted." But apart from the testimony of appellant's extraneous act, the evidence of appellant's guilt was substantial and uncontroverted. The combined testimony from the State's witnesses established, among other facts, that appellant had been stalking Campbell; that they had a history of fighting; that appellant had previously driven a yellow van before the morning of the shooting; that a yellow van pulled up to where Campbell and Lightfoot were staying on the morning of the shooting; that Sanchez and other witnesses heard gunshots; that Sanchez saw appellant standing over Campbell and Lightfoot with a gun in his hand; that just after the shooting and while Sanchez was still in an emotional state, she almost immediately told multiple people that appellant was the gunman; that a black man with a white shirt drove a yellow van away from the scene of the crime; that officers saw appellant, who was wearing a white shirt, driving a yellow van near the area of the crime; that

13

appellant evaded officers in the van (at a high speed and while running multiple stop signs) and on foot; that appellant resisted arrest when an officer found him hiding in the backyard of a home; and that at the time of the arrest, appellant had materials consistent with gunshot primer residue on his hand.

Sanchez testified that from about six or seven feet away, she saw appellant standing over the victims with a gun in his hand. In his closing argument, appellant's counsel attempted to persuade the jury to conclude that Sanchez was not credible because of her history of committing crimes and "telling people things in a position of authority . . . that were not true in order to protect herself." However, if based on Sanchez's history, jurors were prone to find her not credible and to disbelieve her unambiguous, uncontroverted account of the shooting, they would not have been likely to nonetheless convict appellant based upon her other testimony about appellant's extraneous act. Conversely, if the jurors were prone to find Sanchez's testimony credible, they could have convicted appellant based on her other testimony about the shooting without considering her testimony about appellant's prior act with the gun.

The State's development of evidence in front of the jury about appellant's extraneous act spans only six pages of a reporter's record that includes more than four hundred pages of testimony. The State did not refer to the extraneous act in its opening statement or in its closing argument. Also, although appellant argues on appeal that the extraneous act "was character conformity evidence, and not relationship of the parties evidence," in the jury charge, the trial court

14

instructed the jury that it could consider an extraneous offense for the purpose of determining the "previous relationship existing between the accused and the deceased and/or the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of [appellant], if any, in connection with the offense, if any, alleged against him in the Indictment . . . and for no other purpose." We presume that the jury followed this instruction. *See Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996) ("[A]bsent evidence to the contrary, we presume the jury followed the law provided by the charge."); *Karnes v. State*, 127 S.W.3d 184, 196 (Tex. App.—Fort Worth 2003, pet. ref'd).

For these reasons, we conclude that even if the trial court had abused its discretion by admitting evidence about appellant's prior act with a gun, the trial court's ruling did not substantially and injuriously affect the jury's verdict, and it was therefore not harmful. *See* Tex. R. App. P. 44.2(b); *King*, 953 S.W.2d at 271.

Because we conclude that neither error nor harm occurred in the trial court with respect to the admission of evidence about the May 2010 incident, we overrule appellant's sole point.

**Conclusion**

Having overruled appellant's point, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 6, 2012