In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00025-CR**
**NO. 09-25-00026-CR**
_____

**MARK DEWAYNE BROWN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause Nos. F21-36727 and F21-36729**
_____

**MEMORANDUM OPINION**

In cause number F21-36727, a grand jury indicted Appellant Mark Dewayne

Brown for continuous sexual abuse of Rhonda,[1] a child under fourteen years of age.

*See* Tex. Penal Code Ann. § 21.02. In cause number F21-36729, a grand jury indicted

---

[1] We use pseudonyms to refer to the alleged victims and their family members other than Appellant. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

Brown for continuous sexual abuse of Melanie, a child under fourteen years of age. *See id.* Brown pleaded "not guilty" in both cases, but the jury found Brown guilty in both cases.[2] After a hearing on punishment, the jury assessed punishment in each case at forty years of confinement. The trial court sentenced Brown in accordance with the jury's verdicts and ordered that Brown serve the sentences consecutively. Brown timely filed his appeals, raising the same evidentiary issues in each appeal. For the reasons explained below, we affirm.

## Evidence at Trial[3]

### Maxine's Testimony

Maxine, Brown's wife of more than twenty years, testified that even though they are still married, they separated in 2012 when they could not get along anymore. According to Maxine, she and Brown had three children together, including Melanie, who was born on February 7, 2005. Maxine testified that from 2005 to 2012, she and Brown lived in Groves and Melanie and her neighborhood friends, including Rhonda, would often "hang out" at the Brown's house. When Maxine and Brown separated, she and the children lived in a travel trailer in Conroe until the end of 2012. Maxine moved back to Nederland and agreed to allow the children to move in with Brown and his mother at Brown's mother's home in Groves, because the

---

[2] The two cases were consolidated for trial.
[3] We limit our summary to the evidence pertinent to the issues on appeal.

children were missing their friends. Maxine testified she had planned to get her children back once she got a house and a job. According to Maxine, she and Brown's mother did not get along, and Maxine would only see her children every six months or so because Brown's mother often prevented Maxine from seeing them and Maxine was doing drugs at the time.

Maxine explained that when Melanie was living with Brown and his mother, some of Melanie's friends would come to Brown's mother's house to "hang out" with Maxine's children. Maxine testified that she was around Brown when those children were around, but she never noticed anything suspicious. Maxine testified that on one occasion she saw Brown in his mother's living room sleeping on the love seat with Gretchen, one of Melanie's friends who was about twelve years old, and his hand was between Gretchen's legs. Maxine recalled that when she confronted Brown about it, Brown's mother kicked her out of the house. According to Maxine, at one point around 2016, she went through a phone that Brown had given to Melanie and found a photograph of Brown naked with an erect penis and there were text messages from Brown to Melanie stating, "Cum to my room[.]" Maxine recalled that Brown would also ask Christy, another one of Melanie's friends, and Melanie for massages. When Maxine questioned Melanie about what Maxine found on Melanie's phone, Melanie "denied [that] anything ever happened[]" so Maxine did not confront Brown about it at that time.

3

Maxine testified that in 2018, when Melanie was around thirteen years old, Melanie reported to Maxine that in 2012, when Melanie was around seven years old and Maxine's car had a flat tire and she was stranded in Nederland, Brown took the children back to the travel trailer where they had been living with Maxine in Conroe. Melanie told Maxine that on that occasion she woke up to Brown touching around her vagina and trying to put his penis in her, and she got in bed with her brother so Brown would stop. Maxine testified that she confronted Brown regarding what Melanie reported, he denied it, and Maxine did not go to the police because she grew up not trusting the police and Melanie said she did not want her father to go to jail.

Maxine recalled that on February 6, 2021, she was decorating for Melanie's sixteenth birthday sleepover party at Brown's mother's house, and she had a knife in her hand and Maxine told Brown that she "was watching him[]" and "if he ever touched those kids," she "would kill him." According to Maxine, she talked to the police that day, told them what had happened, and Maxine was arrested and taken to jail for threatening Brown, but she was never convicted. Maxine testified that after she got out of jail, she "snuck [her daughters] out[]" of Brown's mother's house and took them to the Garth House for an interview and then Maxine took them to live with her at a friend's house in another town.

4

<u>Testimony of Officer Alex Ferrell</u>

Officer Alex Ferrell with the Groves Police Department, testified that he was called to a home in Groves on February 6, 2021, in response to an assault or domestic disturbance. On his way to the residence, he was advised that the person causing the disturbance was named Maxine, and he was told Maxine had left the scene in a vehicle. Officer Ferrell testified that he was familiar with Maxine and when he recognized her vehicle, he activated his emergency lights, and Maxine stopped. A recording of Officer Ferrell's body camera from the encounter was admitted into evidence and a portion of the recording was played for the jury. On the recording, Maxine can be heard reporting to Officer Ferrell that Brown had molested Melanie and others. Officer Ferrell recalled that after Maxine made statements that supported that she had committed aggravated assault, he arrested her. Officer Ferrell testified that he completed an incident report regarding Maxine's allegations of child sexual abuse, took her statement, notified Child Protective Services, and turned the report over to a detective who handled sex crimes.

<u>Testimony of Lieutenant John Hudson</u>

Lieutenant John Hudson with the Groves Police Department testified that in 2021, he was a sergeant in criminal investigations and primarily handled sex crime cases. In investigating Maxine's allegations of Brown's child sexual abuse, Hudson

5

contacted Maxine. According to Hudson, Maxine's aggravated assault case was filed with the district attorney's office but was "no-billed" by the grand jury.

Lieutenant Hudson asked that someone bring Melanie to the Garth House for an interview, and Maxine agreed to bring Melanie. Hudson recalled that he had reservations about Maxine bringing Melanie because Maxine had just been arrested for putting a knife to Brown's throat and Maxine alleged that she did so because Melanie had told Maxine about Brown's sexual abuse. Hudson explained that "it has happened before where people say something like that to try to get out of being arrested." Hudson testified that instead of waiting for Maxine to bring Melanie to the Garth House, he instead went to Melanie's high school and spoke with Melanie. Based on his conversation with Melanie, Hudson scheduled Melanie for an interview at the Garth House. Hudson recalled that Melanie gave an interview at the Garth House and provided Hudson with other names of people for him to contact in his investigation. Hudson contacted one of the people identified by Melanie, Rhonda, who was an adult at the time Hudson spoke with her. Hudson interviewed Rhonda and she also made allegations against Brown, which Rhonda stated had occurred when Rhonda was eleven years old and younger. Hudson explained that based on Hudson's training and experience, he believed Rhonda's allegations were credible.

Hudson also interviewed Brown at the Groves Police Department, and Brown left after the interview. A redacted version of the video showing the interview was admitted into evidence and played for the jury.

Melanie's Testimony

Nineteen-year-old Melanie testified that she lived with her mother, Maxine, and her father, Brown, in Groves from the age of three or four years old until she was about eight years old. After that, she moved with her siblings and mother to a trailer in Conroe for about six months. She and her mother and siblings lived briefly with a friend of her mother's, and then when Melanie was in third grade, she and her siblings and Brown moved into their grandmother's home in Groves, where they stayed until February of 2021. Melanie recalled that Brown would be around her friends when they came over, and he would take Melanie and her friends places.

Melanie testified that she remembered one occasion when Christy was sitting in the front seat of Brown's truck, and Brown made Christy feel uncomfortable. Melanie apologized to Christy for what had happened and began sitting in the front seat instead to protect Christy from Brown. According to Melanie, Brown would give Melanie and her friends money to give him massages. When Melanie would give him a massage, he would touch her upper thigh and towards her buttocks. Melanie agreed that the touching felt sexual, it made her feel uncomfortable, and he would touch her friends the same way and make them feel uncomfortable. Melanie

explained she stopped hanging out with her friends as much after that because she "didn't want [her] friends to have to go through . . . what [she] was going through[.]"

Melanie testified that she recalled that the first time Brown inappropriately touched her was in Conroe when she was eight years old, and Brown was staying there with Melanie and her siblings while Maxine was out of town. Melanie testified that she was sleeping next to Brown, and he rubbed her vagina under her clothes and grabbed her hand and moved it up and down on his penis for five or ten minutes. She recalled that she was scared, she told Brown she needed to use the restroom, and after using the restroom, she went to sleep in her brother's room. Melanie testified that a day or two after that incident and around 2013, Brown was taking Melanie and her siblings from Conroe to her mother's friend's house, and Brown rubbed her vagina under her pants in the car while her siblings were asleep in the car. Melanie testified that about six months to a year after the first time he sexually touched her, she was nine or ten years old and at her grandmother's house when Brown again inappropriately touched her. According to Melanie, she was sleeping on the couch and woke up to Brown rubbing her vagina, and after a minute or two she punched him and told him to stop, and he left. Melanie recalled other times when Brown would give her "a slap on the behind" or grab her leg. Melanie remembered sitting with Rhonda and another friend on the couch at her grandmother's house and Brown massaged their legs under a blanket and rubbed Melanie's upper thigh. According

8

to Melanie, after that, Rhonda and the other friend quit hanging out with Melanie. Melanie recalled that Brown often touched her thigh when she would sit by him in the car, and although he would do it in front of her friends, he would never do it in front of family. She testified that he would also on occasion "touch [her] friends" in front of her. Melanie recalled another instance when she was about nine years old and she was playing a game on the Wii, and Brown was watching pornography. She testified that he was about five feet away from her, she could see his penis outside of his pants, and he was touching it "up and down" for about an hour or two. Melanie recalled that when she was eight, nine, and ten, her father would change words in his text messages to her to make the text sexual in nature. She recalled that at one point Brown gave her one of his phones, but she did not recall whether it had a picture of his penis on it.

Melanie testified that when she was around thirteen years old and was staying with her mother while her grandmother was having her house repaired, Melanie told her mother that Brown had touched her vagina while in Conroe. Her mother did not understand why Melanie did not tell her sooner so she could have protected her. They did not go to the police and Melanie assumed it was because her father was the only one making money for the family, and if her father was not making money, they would be homeless. Melanie recalled that the day before her sixteenth birthday party, her grandmother came into the garage where Melaine and her friends were,

9

and her grandmother said that Brown had tried to kill Melanie's mother and that Melanie's mother was lying about the sexual abuse. Melanie yelled at her grandmother and told her grandmother that her mother was telling the truth.

Rhonda's Testimony

Twenty-two-year-old Rhonda testified that she was a close friend of Melanie's from 2010 until around 2014, when Rhonda was approximately seven to eleven years old. Rhonda recalled that she and Melanie would play at Melanie's parents' house almost daily, and other neighborhood children would often come over too. Once Melanie's parents separated and Melanie moved to her grandmother's house, Rhonda only went to Melanie's grandmother's house a few times.

Rhonda recalled a specific time that Brown touched her inappropriately but "also remember[ed] it not being the only time[,]" despite her not remembering the details of all the other times. Rhonda testified that, when she was about eight years old and at Melanie's parents' house, Brown asked her to come sit on the couch, he put her on his lap, he grabbed a blanket, threw it over them, and rubbed her vagina over her clothes for what felt like a long time. According to Rhonda, it "wasn't a one-time thing at all[,]" and he commonly told her to "come sit on my lap" and it "ended up being the same thing." She also recalled that when she was at Melanie's grandmother's house about two years later, Melanie got hurt while they were playing and needed Icy Hot for her back. So, they all went inside the house. Brown then told

10

Rhonda to "come here[,]" and she got on his lap while they watched a movie. Rhonda testified that Brown put a blanket over her, he penetrated her vagina with his fingers, and she felt a burning sensation. She recalled that she told him it hurt and moved away, but he would not let her up. She could not remember how she finally got up, and she did not remember going back to that house after the incident. Rhonda testified that Brown touched her inappropriately at least four or five times in total and that, until 2021 when Detective Hudson called her, she did not tell anyone about the touching because she was embarrassed. She gave Detective Hudson her statement and told her mother what had happened.

Christy's Testimony

Twenty-year-old Christy testified that she has been friends with Melanie since she was nine years old, and they were best friends when they were younger. According to Christy, she and Melanie would hang out at Melanie's grandmother's house. Christy last saw Brown when she was in the eighth grade. She recalled Brown was at the house most of the time and sometimes he would hang out with the children that came over, and he would offer them candy if they would give him a massage. Christy testified that she started noticing Melanie being very uncomfortable around Brown.

Christy recalled that on one occasion, Brown took Melanie and Christy to the store. Melanie did not want to sit next to Brown in the truck, so she asked Christy

to. According to Christy, Brown rubbed her upper thigh the whole way there. Christy testified that after that incident, Brown would rub her thighs each time she was next to him and every time she gave him a massage, and he would moan and make her feel uncomfortable. She remembered times when he would rub her thighs when she was around ten or eleven years old. She recalled that she did not say anything to anyone about the touching because she was scared Brown "was going to do something worse[,]" and she did not stop going to the house because she was Melanie's best friend. Christy believed that Brown's mother "knew what was going on[]" and Christy felt like she was the only person Melanie could talk to and not feel judged. Christy testified that she could hear Brown watching pornography when she was at the house. According to Christy, on another occasion when Brown was watching pornography, he called Christy and Melanie into the room, his penis was exposed, and he asked for a massage. She was scared and "started to block everything out and just looked at the wall" and let Melanie talk to him because Melanie did not really have a reaction and it seemed like it had happened to Melanie often.

Christy and Melanie stopped hanging out together in 2019 when they started high school because they were involved in different extracurricular activities. Christy testified she now feels guilty about not telling anyone and now that she is an adult, she realizes that if she would have said something then maybe "more things

could have been prevented." Christy recalled that other friends—Linda, Tina, Gretchen, and Gretchen's little sister, Kimberly, would sometimes also be with them at Brown's mother's house.

Gretchen's Testimony

Twenty-two-year-old Gretchen testified that she met Brown when she was six or seven years old and she was friends with Melanie and Melanie's brother. Gretchen recalled she would go to Brown's mother's house almost every day up until she moved to Louisiana when she was eleven years old. Gretchen recalled, on one occasion when she was around nine years old, Melanie and her brother were asleep and when Gretchen walked by Brown, he spun Gretchen around, put her on his lap, covered her with a blanket, and grabbed her chest. She also remembered another occasion when she was wearing a skirt and he would repeatedly throw things on the ground and ask her to pick them up because she was wearing a skirt, and she recalled another occasion when he made a sexually suggestive comment to her. When she was around eighteen years old, Detective Hudson contacted her, and she reported what had happened to her.

Kimberly's Testimony

Eighteen-year-old Kimberly testified that she is Gretchen's sister, and she met Brown because his daughter, Melanie, was on her softball team and they became friends. Kimberly was six or seven years old when she met Brown and she would

hang out with Melanie at Melanie's house almost every day for about two years until she moved away. According to Kimberly, when she was at Melanie's house, Brown would touch her inappropriately. She recalled that on one occasion, Brown pulled her onto his chair, started tickling her, rubbing his hand down her body, and started touching her vagina over her clothes. Kimberly recalled that a few months later, she was playing outside and went into the house to use the bathroom, and Brown threw her on the bed, started rubbing her chest under her clothes, undid her pants, and rubbed her vagina under her clothes for a few seconds. Kimberly remembered that before he could get her pants completely off, someone walked into the house and Brown walked out and left her there. According to Kimberly, although she tried her best to avoid Brown when she was at the house, he touched her inappropriately by rubbing her body almost every time she was there, during the span of a year or two, up until she moved to Louisiana. Kimberly testified that she did not tell anyone about the touching because she was scared and embarrassed. It was not until law enforcement contacted her sister in 2021 that Kimberly told her sister, her mother, and law enforcement that Brown also sexually abused her.

Linda's Testimony

Linda testified that she moved to Groves when she was six or seven, and Melanie was the first friend she made in Groves. Linda recalled that she and Rhonda would go over to Melanie's parents' house and Linda also remembered going over

14

to Brown's mother's house. Linda testified that on one occasion when she was eight or nine, Brown told her, Melanie, and Linda's sister, Tina, to undress down to their sports bra and underwear, and he videoed them dancing while he helped them undress. Linda later told her school counselor and her family about the incident, but no legal action resulted.

Linda recalled two instances when she was around eight, nine, or ten years old when she saw Brown inappropriately touch her sister, Tina, who was sixteen months younger than Linda. As for the first incident, Linda recalled sitting on the floor and Tina was on the bed and Brown "tried to go under her dress and touch up her leg[]" and Tina left the room distraught and wanting to go home. Linda testified that she witnessed Brown inappropriately touch Tina a second time when Brown was taking Linda and Tina back to his home, and he grabbed Tina's upper inner thigh. Tina ran inside and immediately wanted to go home. Linda testified that she was enraged when she saw Brown touch Tina both times, and Linda blamed herself because she was unable to protect her sister. Linda testified that her parents were friends with Melanie's parents, but after Linda and Tina later told their parents about "the situation[]" with Brown, the parents "stopped hanging out[]" together. Linda also testified that she begged her stepfather not to confront Brown because Melanie "didn't want it out in the open," and Tina "didn't want to deal with all the court things and having to face [Brown]."

Linda also testified that on one occasion she witnessed Brown tickling Kimberly, and Kimberly ran away from the house screaming and crying. Linda chased after her, and Linda never saw Kimberly at Brown's house again. Linda witnessed Brown giving Christy and Melanie special attention, and when they would ask Brown for money, he would say, "Pay for it[,]" and then they would disappear with Brown for a little bit and come back with money. Linda testified she knew what was going on, but she did not say anything at the time because Melanie was still living with Brown, and it could be dangerous for Melanie.

Tina's Testimony

Eighteen-year-old Tina testified that she and her sister were childhood friends with Melanie, and Tina met Melanie when Tina was around six or seven years old. According to Tina, a group of children that included herself, Linda, Melanie, Gretchen, Christy, Kimberly, and others would often "hang out" at Melanie's grandmother's house. Tina recalled going to the house almost daily. Tina testified that Brown always made Tina feel uncomfortable, he was always watching her, and he inappropriately touched her on two occasions. Tina testified that the first time he touched her inappropriately was when she was maybe eight or nine years old, and she was alone in the truck with Brown in his driveway after Melanie and Linda got out of the vehicle, and he "rubbed up [Tina's] thigh." Tina recalled that once Brown's hand "got far enough," she got out of the vehicle and ran inside the house.

16

She told her sister what had happened and told her mother "days after that or, maybe, even months" later. Tina testified that the second time Brown inappropriately touched her was very close in time to the first instance, and she was on Melanie's grandmother's bed under the covers watching videos on a tablet and Brown came into the room, got into the bed but stayed on top of the covers, and put his hand under the covers and under her dress and touched her inner thigh for what felt like a long time. According to Tina, she got up and ran crying to where people were in the living room and told her sister what had happened. After that, Tina never went back over to that house because she was afraid Brown would touch her somewhere else.

Issues on Appeal

In both appeals, Brown raises the same issues and makes the same arguments. In his first issue, Brown argues the trial court erred in admitting hearsay over Brown's objection when Lieutenant Hudson testified that he intentionally interviewed Melanie to determine if there was any merit to the allegations and it "was allowed to relate her confirmation of appellant's guilt." In issues two through six, respectively, Brown argues the trial court committed reversible error in admitting the testimony relating to alleged extraneous offenses or bad conduct by Brown against five other victims—Christy, Gretchen, Kimberly, Linda, and Tina.

Standard of Review

We review both a trial court's ruling on the admission or exclusion of evidence and a trial court's ruling on the admissibility of extraneous offense evidence under an abuse-of-discretion standard of review. *Colone v. State*, 573 S.W.3d 249, 263-64 (Tex. Crim. App. 2019) (we review rulings on the admission of evidence for an abuse of discretion); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (a ruling on the admissibility of extraneous offense evidence is examined for an abuse of discretion). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005); *Favorite v. State*, No. 09-16-00162-CR, 2017 Tex. App. LEXIS 5656, at *27 (Tex. App.—Beaumont June 21, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd)).

The erroneous admission of evidence, including extraneous offense evidence, is generally considered a non-constitutional error. *See Walters v. State*, 247 S.W.3d

18

204, 218-19 (Tex. Crim. App. 2007); *Favorite*, 2017 Tex. App. LEXIS 5656, at \*27 ("'The erroneous admission of extraneous-offense evidence constitutes non-constitutional error[.]'") (quoting *Pittman v. State*, 321 S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2010, no pet.)). An appellate court may not reverse for non-constitutional error if, after examining the record as a whole, the appellate court has "fair assurance that the error did not have a substantial *and* injurious effect or influence in determining the jury's verdict." *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (emphasis in original) (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *see also* Tex. R. App. P. 44.2(b).

## Indirect Hearsay

In his first issue in both appeals, Brown argues that the trial court committed reversible error in admitting hearsay over Brown's objection when Hudson testified that he intentionally interviewed Melanie to determine if there was any merit to the allegations and "was allowed to relate her confirmation of appellant's guilt."[4] The testimony Brown complains of is the following testimony by Lieutenant Hudson:

---

[4] In the appeal of his conviction for continuous sexual abuse of Rhonda, Brown states that even though his first issue is challenging the admissibility of Melanie's hearsay testimony, "the hearsay was just as damaging" in Rhonda's case. Brown argues that "[i]t is important to note that the State had just begun its presentation of the allegations and the hearsay was adduced before either of the alleged victims even testified." Brown contends that because Hudson testified before the victims, the hearsay testimony bolstered the testimony of both alleged victims.

19

| | |
|---|---|
| [Prosecutor]: | Can you explain to the jury why you were concerned about [the timing of Maxine's allegations of Brown's sexual abuse against Melanie]? |
| [Lt. Hudson]: | Well, [Maxine] had just been arrested for putting a knife to her . . . husband's . . . throat. She was arrested for essentially a first-degree aggravated assault family violence. And then she made the outcry that her daughter was sexually abused, and that's not - - it has happened before where people say something like that to try to get out of being arrested. |
| [Prosecutor]: | So, what - - so, did you wait for [Maxine] to bring [Melanie] to Garth House; or did you do something else? |
| [Lt. Hudson]: | I did something else. |
| [Prosecutor]: | What did you do? |
| [Lt. Hudson]: | I went to the high school. I had [Melanie] pulled out of class, and I spoke to her briefly. I didn't go into depth, but I wanted to know if there was any merit to the allegations about the sexual abuse. |
| [Prosecutor]: | When you talked to her at the school, did you find that there was merit to the allegations? |
| [Defense counsel]: | Your Honor, I'm going to object to hearsay. |
| [Prosecutor]: | I'm not asking him to say what she said. I'm just asking him under his training and experience if he found there to be merit to continue with the investigation. |
| [Defense counsel]: | It's based on hearsay statements made by a third party. |

20

THE COURT:        Overruled. Go ahead.

[Lt. Hudson]:     She did say that there were some allegations.

[Defense counsel]: Again, your Honor, objection. She said. Hearsay.

[Prosecutor]:     She just said that there were allegations. It's not anything specific as to what she said.

[Defense counsel]: Again, Judge, hearsay.

THE COURT:        What's your response to that?

[Prosecutor]:     It's just the - - to getting to the investigation, it's just how he got through the steps of his investigation.

THE COURT:        Okay. He spoke to her, and then he moved to something else - -

[Prosecutor]:     Yes.

THE COURT:        - - based upon that?

[Prosecutor]:     Yes.

THE COURT:        Ask your next question.

According to Brown, the State's questions for Hudson were asked so Hudson could then relate what Melanie said which was "in essence that appellant was guilty." Brown contends that the State failed to establish an exception to the hearsay rule, and Melanie's out-of-court statements made to Hudson were offered for the purpose of establishing that they were in fact true. Brown argues that this

21

inadmissible hearsay "set the stage for the entire rest of the testimony of alleged child victims" and "struck at the heart of the case, in that it allowed harmful evidence before the jury to convince them to convict despite the evidence relying exclusively on the swearing match between the alleged victim and appellant."

"Hearsay is a statement, including a written statement, other than one made by the declarant while testifying at the trial, which is offered to prove the truth of the matter asserted." *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *see* Tex. R. Evid. 801(d). Although hearsay, absent a recognized exception or exemption, constitutes impermissible evidence, "[a]n extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay. *Dinkins*, 894 S.W.2d at 347 (emphasis in original); Tex. R. Evid. 802 ("Hearsay is not admissible unless any of the following provides otherwise: a statute; [the rules of evidence]; or other rules prescribed under statutory authority."). In other words, "[i]f the out-of-court statement is relevant only if the trier of fact believes that the statement was both truthful and accurate, then the statement is hearsay." *Bell v. State*, 877 S.W.2d 21, 24 (Tex. App.—Dallas 1994, pet. ref'd). However, "[i]f the relevancy of the statement does not hinge on the truthfulness of the statement, it is not hearsay." *Id.* Although appearing straightforward on its face, the rule against hearsay commonly requires concentrated scrutiny by the trial courts when, for example, an investigating

officer is called to testify about facts learned during the course of an investigation. *Dinkins*, 894 S.W.2d at 347.

Generally, an investigating officer may testify to how a defendant became a suspect in an investigation without such testimony constituting hearsay. *See id.*; *Lyle v. State*, 418 S.W.3d 901, 904 (Tex. App.—Houston [14th Dist.] 2013, no pet.). However, the officer's testimony cannot, through artful questioning, be offered to prove the veracity of his investigation. *Schaffer v. State*, 777 S.W.2d 111, 114 (Tex. Crim. App. 1989). Such a sequence of questioning and answering may constitute impermissible hearsay "where there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom[.]" *Id.*; *Head v. State*, 4 S.W.3d 258, 261 (Tex. Crim. App. 1999) ("Whether the disputed testimony violates the hearsay prohibition necessarily turns on how strongly the content of the out-of-court statement can be inferred from the context.").

A police officer "should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports on grounds that []he was entitled to tell the jury the information upon which []he acted." *Schaffer*, 777 S.W.2d at 115. In *Schaffer*, the Texas Court of Criminal Appeals explained:

> [W]here there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly. In short, "statement" as defined in

[Rule 801] necessarily includes *proof* of the statement whether the proof is direct or indirect.

*Id.* at 114 (emphasis in original).

Here, Hudson did not repeat Melanie's allegations but instead confirmed through his testimony that part of his investigation involved the need to confirm Maxine's report that Melanie had made allegations against Brown. We are not persuaded that the prosecutor's line of questioning and Hudson's responses indicate that the State intended to inform the jury of the truth of Melanie's statements. *See id.*; *Head*, 4 S.W.3d at 262-63. The record reflects that the statements were admitted not to prove the truth of the allegations Melanie made against Brown, but instead the statements were admitted to explain the steps of Hudson's investigation including determining whether Maxine had fabricated the allegations against Brown and whether Melanie had actually made an outcry to Maxine about Brown, so that Hudson could determine whether he needed to move forward with his investigation of Melanie's allegations. *See Dinkins*, 894 S.W.2d at 347. The record does not reveal an inescapable conclusion that Hudson's testimony was offered to prove that Melanie's allegations against Brown were true. *See Head*, 4 S.W.3d at 262-63 (whether the disputed testimony violates the hearsay prohibition turns on whether the strength of the inference produces an "inescapable conclusion" that the evidence is being offered to prove the substance of an out-of-court statement); *Schaffer*, 777 S.W.2d at 115 (recognizing the admissibility an officer's hearsay statements

24

necessary for the jury's understanding of the events and that are not introduced for the truth of any implications). The trial court did not abuse its discretion in admitting the testimony because the trial court could have reasonably concluded that the evidence had a purpose other than to prove the truth of the matter stated. *See Head,* 4 S.W.3d at 262; *Schaffer*, 777 S.W.2d at 115; *see also Colone*, 573 S.W.3d at 263-64.

Even if the trial court had erroneously admitted the testimony, there would be no reversible error because Melanie testified without objection that Brown sexually abused her. *See Marshall v. State*, 210 S.W.3d 618, 631 (Tex. Crim. App. 2006) (any error in the admission of the complained-of evidence was harmless because the record established that essentially the same evidence was admitted elsewhere in the record without objection); *Gant v. State*, 153 S.W.3d 294, 300 (Tex. App.—Beaumont 2004, pet. ref'd) (where erroneous admission of evidence is cumulative of other properly admitted evidence proving the same fact, the erroneous admission is harmless); *see also* Tex. R. App. P. 44.2(b). We overrule Brown's first issue in both appeals.

Testimony of Extraneous Offenses or Bad Conduct

In issues two through six in both appeals, Brown argues the trial court abused its discretion during the guilt phase of the trial in admitting evidence of extraneous offenses or bad conduct by Brown against Christy, Gretchen, Kimberly, Linda, and

Tina—child victims other than those named in the two indictments for which he was tried. According to Brown, under Rule 403 of the Texas Rules of Evidence, any probative value of each child victim's testimony was significantly outweighed by the extreme prejudicial effect, and the testimony was erroneously admitted at trial over Brown's objections. Brown "recognizes the special statutory provisions in Article 38.37 of the Texas Code of Criminal Procedure," but argues that because Article 38.37 only refers to Rules 404 and 405 it "do[es] not abrogate Texas Rule of Evidence 403." Brown contends that the "unrelated" testimony depicted him as a sexual predator and a criminal generally to support the convictions, and that the cumulative effect of the erroneous admission of the child victims' testimony harmed him and denied him a fair trial.

In each case, Brown was charged with the continuous sexual abuse of a child under section 21.02 of the Penal Code, an offense to which article 38.37 applies. *See* Tex. Code Crim. Proc. Ann. art. 38.37, §§ 1(a)(1)(A), 2(a)(1)(B); Tex. Penal Code Ann. § 21.02. Generally, the State cannot submit evidence of prior bad acts, wrongs, or other acts to show that the defendant acted in accordance therewith or had a tendency to commit the crime. Tex. R. Evid. 404(b). However, there are exceptions to the general rule, and they are applicable to this trial. "In a trial of the sexual assault of a child, there are special circumstances that 'outweigh normal concerns associated with evidence of extraneous acts.'" *Howell v. State*, No. 09-16-00441-CR, 2018 Tex.

26

App. LEXIS 5190, at *7 (Tex. App.—Beaumont July 11, 2018, no pet.) (mem. op., not designated for publication) (quoting *Alvarez v. State*, 491 S.W.3d 362, 367 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd)); *Jenkins v. State*, 993 S.W.2d 133, 136 (Tex. App.—Tyler 1999, pet. ref'd). At the trial of a defendant accused of, among other things, continuous sexual abuse of a child, evidence the defendant committed a separate sex offense against another child may be admissible under section 2 of article 38.37 "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. Ann. art. 38.37, § 2(a)(1)(B), (b). Indeed, article 38.37 of the Texas Code of Criminal Procedure specifically allows for the introduction of a criminal defendant's extraneous offenses in such a case. *See id.* 38.37; *see also Howell*, 2018 Tex. App. LEXIS 5190, at **7-8 (article 38.37 as amended "allows for the admission of evidence of extraneous offenses committed by the defendant against individuals other than the victim[]") (citing *Aguillen v. State*, 534 S.W.3d 701, 711 (Tex. App.—Texarkana 2017, no pet.)).

When a trial court considers the admission of extraneous offense evidence offered under article 38.37, section 2 and Rule 404(b), the trial court also considers the balancing test under Rule 403 if the defendant lodges a timely Rule 403 objection before the evidence is admitted. *See Clark v. State*, No. 09-20-00083-CR, 2021 Tex. App. LEXIS 9500, at **30-31 (Tex. App.—Beaumont Nov. 24, 2021, no pet.)

(mem. op., not designated for publication) ("Although admissible under Rule 404(b), evidence may still be excluded under Rule 403[.]"); *Howell*, 2018 Tex. App. LEXIS 5190, at **8-9 ("Extraneous offense evidence offered under article 38.37, section 2 must also meet the balancing test under Rule 403 if the defendant lodges a timely Rule 403 objection before it is admitted.") (citing *Bezerra v. State*, 485 S.W.3d 133, 140 (Tex. App.—Amarillo 2016, pet. ref'd)); *see also Dies v. State*, 649 S.W.3d 273, 284 (Tex. App.—Dallas 2022, pet. ref'd) (same); *Belcher v. State*, 474 S.W.3d 840, 847 (Tex. App.—Tyler 2015, no pet.) (same); *Fahrni v. State*, 473 S.W.3d 486, 492 (Tex. App.—Texarkana 2015, pet. ref'd) (same). Generally, all relevant evidence is admissible. Tex. R. Evid. 402. Relevant evidence is evidence that tends to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. Tex. R. Evid. 401. Relevant evidence may be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Probative value is the measure of how strongly the evidence serves to make more or less probable the existence of a fact of consequence to the litigation, coupled with the proponent's need for the evidence. *Gigliobianco v. State*, 210 SW.3d 637, 641 (Tex. Crim. App. 2006). "'Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more

probative than prejudicial.'" *Clark*, 2021 Tex. App. LEXIS 9500, at \*\*30-31 (quoting *Montgomery*, 810 S.W.2d at 389; *Gittens v. State*, 560 S.W.3d 725, 732 (Tex. App.—San Antonio 2018, pet. ref'd)); *see Favorite*, 2017 Tex. App. LEXIS 5656, at \*33 (citing *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006)). Relevant evidence should be excluded only when there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001). Whether it causes "unfair prejudice" does not mean simply that the evidence injures the opponent's case. *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999). "Rather[,] it refers to 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (quoting *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993)).

Once a trial court determines that extraneous offense evidence is admissible under article 38.37 or Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudice. *Clark*, 2021 Tex. App. LEXIS 9500, at \*\*31-32 (to preserve a Rule 403 challenge to extraneous offense evidence admissible under Rule 404(b), a defendant must timely object); *Howell*, 2018 Tex. App. LEXIS 5190, at \*\*8-9 (trial court must undertake Rule 403 balancing test if defendant timely objects

29

on grounds that extraneous offense evidence admissible under article 38.37 is more prejudicial than probative); *Favorite*, 2017 Tex. App. LEXIS 5656, at *33 (same).

> [W]hen undertaking a Rule 403 analysis, [the trial court] must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco*, 210 S.W.3d at 641-42. In practice, "these factors may well blend together." *Id.* at 642. Once a Rule 403 objection is made, the trial court has no discretion whether to engage in the balancing test required by that rule. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). However, the trial court is not required to place any findings it makes or conclusions it draws on the record when engaging in the balancing test, and the trial court is presumed to have engaged in the required balancing test once Rule 403 has been invoked. *Id.*

During trial but prior to Christy's, Gretchen's, Kimberly's, Linda's, and Tina's testimony, the State argued it was proffering their testimony under article 38.73 and Rule 404(b) to show Brown's opportunity, intent, preparation, and motive. Defense counsel conceded that article 38.37 allows other child victims to testify as to a defendant's extraneous acts of sexual abuse, but defense counsel argued that it was necessary for the trial court to conduct a Rule 403 balancing test to determine

30

the admissibility of the testimony. The court held an admissibility hearing outside the presence of the jury to determine whether the testimony of Brown's alleged extraneous offenses or bad conduct against each one of them was admissible. *See* Tex. Code Crim. Proc. Ann. art. 38.37. The trial court in its written "Findings of Fact and Conclusions of Law Concerning Defendant's Motion to Exclude Tex. R. Evid. 404(b) and/or Tex. Code Crim. Proc. Art. 38.37 Testimony" stated its reasons for concluding that Christy's, Linda's, and Tina's testimony was admissible under Rule 404(b), and that Gretchen's and Kimberly's testimony was admissible under both Rule 404(b) and article 38.37. As to Rule 403, the trial court included the following conclusions in its findings:

> [] The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403. The Rules of Evidence also provide under Rule 403 that it is inherent to admit all relevant evidence, unless the probative value is substantially outweighed by unfair prejudice. Unfair prejudice means any undue tendency to suggest the decision on an improper basis commonly, though not necessarily, an emotional one.

> [] In this case the Court finds that the evidence (testimony of [Christy, Gretchen, Kimberly, Linda, and Tina]) after a hearing outside the presence of the jury, is relevant to proving matters necessary in this case for a jury to consider and that there is no constitutional, statutory, or evidentiary reason to exclude it. Evidence of other crimes, wrong, or acts are not admissible to prove character of a person in order to show that, thus, if he's done it before, then he acted in conformity in this case. However, it is admissible and may be allowed for other purposes such as, in these cases, (1) intent; (2) opportunity; and (3) motive. Those are

three of the possible reasons that this type of evidence could be admitted related to issues in this case.

[] Accordingly, the Court allows the State's proposed testimony (of [Christy, Gretchen, Kimberly, Linda, and Tina]) for the purposes of proving intent, opportunity, and motive. Furthermore, the Court deems its probative value is not substantially outweighed by unfair prejudice, confusion of the issues, misleading the jury, undue delay, nor needless presentment of cumulative evidence.

Regarding the first factor in the balancing test, evidence of a separate sexual offense against a child admitted under article 38.37, section 2(b), the trial court concluded the evidence is probative of a defendant's character or propensity to commit sexual assaults on children. *Dies*, 649 S.W.3d at 285 (citing *Bradshaw v. State*, 466 S.W.3d 875, 883 (Tex. App.—Texarkana 2015, pet. ref'd)). We agree. The similarities between the abuse Christy, Gretchen, Kimberly, Linda, and Tina suffered and the abuse that Melanie and Rhonda suffered was relevant and probative of Brown's character or propensity to commit similar offenses with children around the same age as Melanie and Rhonda. The first factor weighs strongly in favor of admission.

As for the second factor, the State's need for the other child victims' testimony, there was no independent eyewitness testimony or physical evidence of the alleged abuse, such as DNA or documented injuries to Melanie and Rhonda. On appeal, Brown argues it was a "swearing match" case. *See id.* at 286 (citing *Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd);

32

*Gaytan v. State*, 331 S.W.3d 218, 227 (Tex. App.—Austin 2011, pet. ref'd)). In "he said, she said" sexual abuse cases such as this, "Rule 403[] should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant[.]" *See Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009). We conclude that this factor also weighs in favor of admission.

As for the third factor, evidence of extraneous sexual bad acts is inflammatory by its very nature and may be prejudicial. *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). But the potential for the challenged evidence to be inflammatory and prejudicial was diminished in this case by the fact that Christy's, Gretchen's, Kimberly's, Linda's, and Tina's allegations against Brown were no more serious than Melanie's and Rhonda's allegations against Brown. *See Robisheaux*, 483 S.W.3d at 220. That said, we conclude, based on the record, this factor weighs slightly against admission.

Considering the fourth factor, the ultimate issue at trial was whether Brown committed the offenses against Melanie and Rhonda as alleged in the indictments. When Christy, Gretchen, Kimberly, Linda, and Tina testified at trial, the trial court mitigated the tendency of the extraneous offense evidence to confuse or distract the jury from the main issues at trial by providing the jury with a limiting instruction regarding an extraneous offense, instructing the jury to use the evidence and

testimony only for the limited purposes of proving Brown's motive, opportunity, and intent. "While 'there is always a potential that the jury may be unfairly prejudiced by the defendant's character conformity[,]' 'this impermissible inference can be minimized through a limiting instruction.'" *Favorite*, 2017 Tex. App. LEXIS 5656, at \*36 (quoting *Beam v. State*, 447 S.W.3d 401, 404 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). The jury is presumed to have followed the court's instructions. *Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003); *Favorite*, 2017 Tex. App. LEXIS 5656, at \*36. The fourth factor weighs in favor of admission.

Regarding the fifth factor, the challenged evidence was neither scientific nor technical in nature, and it pertained to matters, including victim credibility, which could easily be understood by a jury. *See Robisheaux*, 483 S.W.3d at 220-21. We conclude the fifth factor also weighs in favor of admission.

Turning to the sixth factor, although the extraneous offense testimony comprised a substantial part of the trial in terms of time and number of witnesses, and the testimony was mentioned by the State in its closing argument, Christy, Gretchen, Kimberly, Linda and Tina, each gave individual accounts of Brown's extraneous bad acts specifically as to them, and the testimony was not repetitive. Therefore, we conclude this factor only weighs slightly against admission.

Here, the trial court, after balancing the Rule 403 factors, could have reasonably concluded that the probative value of the evidence in question was not

34

substantially outweighed by the danger of unfair prejudice. Accordingly, we find that the trial court did not abuse its discretion in admitting the extraneous offense evidence. *Devoe*, 354 S.W.3d at 469. Because we find no error, we need not determine if the alleged error was harmful. *See* Tex. R. App. P. 44.2(b). We overrule issues two through six in both appeals.

Having overruled all issues, we affirm the trial court's judgments.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on November 7, 2025
Opinion Delivered February 25, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.